FIRST DIVISION
JUNE 09, 2008

No. 1-07-2123

| | | |
|---|---|---|
| OSBY DIXON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 03 L 10691 |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | Honorable |
| | ) | Ralph Reyna, |
| | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiff Osby Dixon sued his employer, defendant Union Pacific Railroad Company,

under the Federal Employers' Liability Act (FELA) (45 U.S.C. §51 et seq. (2000)), after a

handrail on a train car came loose and plaintiff fell several feet to the tracks below. After a trial,

a jury awarded plaintiff $131, 318. 66 for pain and suffering and $54,500 for economic loss, but

nothing for disability. Plaintiff appeals claiming that the trial court erred by giving a jury

instruction concerning plaintiff's failure to mitigate damages, and that the awards for economic

loss and disability are against the manifest weight of the evidence. For the reasons discussed

below, we reverse and remand for a new trial solely on the issue of damages for disability.

BACKGROUND

On November 11, 2001, while working in defendant's railyard as a freight conductor, plaintiff walked along a platform on the side of a stationary train car, holding on to the handrail. The handrail came loose, and he fell. Plaintiff's first amended complaint, filed November 8, 2006, alleged one count, that defendant railroad violated the FELA by negligently failing to provide plaintiff railroad employee with a safe place to work. Specifically, plaintiff alleged that defendant "[v]iolated 49 USCA Sec. 20302 (a)(2), commonly known as the Safety Appliance Act, when it used or allowed to be used on its railroad line a railroad car (vehicle) which was equipped with an unsecured handhold."

At trial, the witnesses included: plaintiff and his wife; Dr. Mark Nikkel, his orthopaedic surgeon; Nancy Milnes, a licensed clinical social worker who treated plaintiff for psychological issues; Dr. Malcolm Cohen, an economics expert retained by plaintiff; Salvadore Gomez, the yard manager at the time of plaintiff's accident; Thomas Lally, the railroad employee who investigated the accident for the railroad; and Michael Haggerty, the railroad employee who inspected the car after the accident.

Plaintiff's first witness, Nancy Milnes, did not appear in person. Instead, her videotaped evidence deposition was played for the jury. Nancy Milnes, a licensed clinical social worker, testified that she first saw plaintiff on March 13, 2002. His complaints included panic attacks, sleeplessness, depression and hopelessness that he would never recover.

Concerning the accident, plaintiff told Milnes that he was alone in the switching yard, setting up trains to couple with each other, when he climbed onto a train to check the connection

2

and the handrail dislodged, causing him to fall back on to the next track. He told her that he hit his back, that he was unsure if he could move and that he was afraid that another train would come down the track. Plaintiff told Milnes that although his arm, back and leg were hurt, he was able to get up and call his supervisor, and that he was then taken to Elmhurst Hospital.

At the initial evaluation, Milnes concluded that plaintiff was "very depressed" and that his depression was caused by "the combination of the original trauma, plus the repeated trauma of medical procedures and the financial and physical limitations of being hurt." Based on plaintiff's reports of flashbacks, Milnes also concluded that plaintiff had post-traumatic stress disorder from the accident. Milnes testified that he had reported to her that railroad tracks were located in back of his house and at night, he would wake when he heard the trains and feel panicked. Milnes also concluded that plaintiff posed a moderate risk for suicide, and found this directly related to the accident. On December 9, 2002, Milnes completed a disability determination report for the social security administration, in which she concluded that plaintiff was unable for work return. Milnes testified that plaintiff was still exhibiting suicidal tendencies when Milnes last saw him in March 2004.

Milnes testified that she was aware that plaintiff was also under the care of a psychiatrist, Dr. Moolayil, who had prescribed medication. Although Milnes left messages for Dr. Moolayil, he never returned her calls and she never spoke with him. Milnes testified that she saw plaintiff approximately 11 times in 2002. Then there was over a year, from September 26, 2002 until November 9, 2003, when she did not see plaintiff. During this time, Milnes tried to keep in contact by telephone. When Milnes saw plaintiff again on November 9, 2003, he reported panic

attacks, sleep problems and pain in his ankle and back. Milnes testified that she last saw plaintiff on March 30, 2004.

On cross-examination, Milnes testified that she saw plaintiff three times in 2004: once in February and twice in March. She testified that plaintiff did not have a specific plan to commit suicide and that she never spoke to any of plaintiff's other treaters about his ability to work. She testified that her conclusion that plaintiff was not able to work was not a permanent conclusion, and that she did not know how plaintiff was feeling today.

Next, plaintiff took the stand and testified that he was 41 years old, and lived in South Holland, Illinois with his wife and 10 year-old son. He started working for defendant in April 1998 as a janitor. In January 2001, he began training to become a conductor, which lasted six to eight weeks. After taking a test, he became a freight conductor, which plaintiff described as someone who "hooks up trains." Plaintiff stated that in addition to wages, defendant provided "good benefits" such as health insurance, vacations and "bonus checks sometimes." Although he was certified as a conductor in March or April 2001, he did not receive full conductor's pay; that would come with seniority. Plaintiff testified that he "loved" working for the railroad.

Plaintiff testified that on November 12, the day of the accident, he had started his shift on November 11 at 11 p.m., in the Proviso East yard, which is in the northwest suburbs of Chicago. Plaintiff testified that the Proviso yard is what is known as a "hump yard." Plaintiff explained that a hump yard is in the shape of a bowl; that at the top of the bowl, railroad workers will send a car down by itself; that in the middle of the bowl, there are 30 different tracks into which the car may be sent, in order to make up a train; and that the car is directed into a particular track by

4

setting certain switches.

Plaintiff testified that his assignment that night was to put together trains by pulling cars from different tracks. The car he fell off was a covered hopper car. To turn the wheel that operates the hand brake, he had to climb up a ladder on the side of the car and stand on a platform on the side of the car, holding on to a handrail. At approximately 2 a.m. on November 12, when the hopper car was on Track 28, plaintiff climbed up the ladder, stood on the brake platform, turned the brake wheel, and then walked to the right (or south) side of the car, in order to dismount. Track 29 was on the right side of the hopper car. As he was walking toward the right side, he was holding on to the handrail. As he was turning the corner and lowering his foot to the step, the handrail slid out, and he lost his balance and fell. He came down on his right foot, and then "flew back" on to the next track, track 29. His wrist and back hit track 29.

Plaintiff testified that when he hit the track, he was reminded of a time when he was 12 or 13, and he was in a swimming pool, and he saw "death pass." Then he "crawled" off that track and used the radio on his person to notify the yard master that he was hurt. Another railroad employee took him to the hospital, where X-rays were taken of his right wrist and he received pain medication. After being released from the hospital, he returned to the railyard where he received a drug test. The following day, November 13, plaintiff went on his own to Oak Lawn Medical Center, where Dr. Nikkel, an orthopaedic surgeon, prescribed pain medication and physical therapy.

Plaintiff testified that, eventually, Dr. Nikkel recommended arthroscopic surgery on

plaintiff's right ankle, which was performed in February 2002 and followed by more physical therapy.  (Later medical testimony illustrated that it was diagnosed as a "ostechondral lesion" in his right ankle.) Plaintiff testified that he did not feel any significant improvement, so Dr. Nikkel recommended additional surgery, which was performed in July 2002. Plaintiff's understanding of the surgery was that Dr. Nikkel was removing bone from plaintiff's right knee to place in his right ankle, and placing bolts or screws in his ankle.  As a result of the surgery, plaintiff developed an infection.   Plaintiff was then readmitted to the hospital for three or four days. After his second release from the hospital, plaintiff was "sent *** home with the IV" and took medication for two months.

Plaintiff testified that after the wound healed, he resumed physical therapy.  When Dr. Nikkel removed the cast, plaintiff stopped using crutches and started using a cane, which he still uses on a daily basis.  Plaintiff hoped that after the second surgery, he could return to work, but that did not happen.  Dr. Nikkel prescribed the pain medication Vicodin, for approximately two years, and also prescribed arthritis medication.  Plaintiff testified that he still experiences pain in his right wrist and lower back.

Plaintiff next testified concerning his emotional condition following the accident.   Since the accident, he has been able to sleep for only three or four hours a night and he has nightmares "just reenacting of the train."   During the first two months after the accident, he was sad, cried "a lot" and became "mad with my family for no reason."  At his wife's suggestion, he sought psychiatric counseling.  He received Dr. Moolayil's name "from Union Pacific insurance, they gave me a listing."  Plaintiff first saw Dr. Moolayil on December 12, 2001.  In 2002, he received

medication for stress and sleeplessness, including Zoloft. Plaintiff testified that he was still in Dr. Moolayil's care and that he last saw Dr. Moolayil approximately five weeks prior to trial. At first, plaintiff saw Dr. Moolayil twice a week, and then over time it was reduced to twice a month. Dr. Moolayil did not testify at trial.

Plaintiff testified that on two occasions, he saw Mr. Carpenter, a licensed clinical social worker, who worked with Dr. Moolayil. After Mr. Carpenter passed away, plaintiff began seeing in March 2002 another social worker, Nancy Milnes, whose name plaintiff received "from the railroad." When plaintiff did not have appointments with Milnes, she called on the telephone once or twice a week. Also, when he stopped seeing Milnes, the telephone calls continued for a period of time.

Plaintiff testified that he still had nightmares and flashbacks. About the flashbacks, plaintiff testified: "I'm having them now, sir, when you show me [a photograph] of the car. It happens a lot." Plaintiff testified that there were train tracks "in my backyard" and the trains come through "all day, all night." Plaintiff testified that when a train goes by, "that's when a lot of flashbacking happens." Before the accident, he and his wife had an active social life, going to barbecues and movies. Now, he does not "like doing nothing," he becomes angry at his wife "for no reason" and he cannot play sports with his son.

Plaintiff testified that physically, he cannot do any of the household chores that he used to perform, such as mowing the lawn. Plaintiff testified that he "loved cleaning, helping my wife around" the house. Plaintiff testified that he has not worked a day since the accident, that when he walks he feels "feet stabbing, burning sensation," and that when he stops walking, he still

7

experiences "throbbing, swelling." Plaintiff testified that he had pain in his back "all the time" and that the medication he took for back pain did not work.. He also experienced stiffness in his wrist. Plaintiff testified that he had not had a pain-free day or night since the accident.

On cross-examination, plaintiff testified that prior to working for the railroad, he had jobs with Blue Island Plastics for $9 per hour, with Browing-Ferris for $16 per hour, and the Country Club Hills Park District for $10 per hour. In September 2000, he was working with the Union Pacific Railroad and earning $12 per hour. In January 2001, when he started working as a conductor, he was paid by the job, instead of by the hour.

On cross-examination, plaintiff testified that he had contact with Chris McGinnis and Jack Mason, who worked in vocational rehabilitation. Plaintiff met "more than once" with McGinnis who came to plaintiff's home. Plaintiff was not sure whether they were hired by the railroad, but plaintiff knew that he did not contact or pay for them.

Plaintiff's next witness was Salvatore Gomez, the manager of yard operations at the Proviso yard at the time of plaintiff's accident. Gomez testified that prior to the accident, he had not noticed any physical or psychological problems with plaintiff.

Plaintiff's next witness was Dr. Malcolm Cohen, an economist who received his doctorate from Massachusetts Institute of Technology in economics and specialized in labor economics. At plaintiff's request, he analyzed plaintiff's economic loss from the accident. In performing this analysis, he considered the wages of three railroad employees who were more senior to plaintiff and three who were less senior. Cohen explained that he used this information to form "the best prediction" of what plaintiff would have earned. In calculating the loss, Cohen

testified that he was "assuming that he's totally disabled so that there's no future compensation." Cohen estimated the loss twice: once with a retirement age of 62, and once with a retirement age of 65   Assuming a retirement age of 62, Cohen estimated the present value of his economic loss at $1,479, 179; and assuming a retirement age of 65, Cohen estimated the present value of loss at $1, 655, 932.

Cohen testified that for the year 2001, he used plaintiff's "annualized wage."  For the years 2002 through 2004, Cohen used the actual "average of [plaintiff's] peers."  Starting in 2005, Cohen used the average of the years 2002 and 2004, and adjusted 3% per year for inflation. From these "estimated wage[s]," Cohen then subtracted "all the things that [plaintiff] would have had to pay had he been working," such as taxes, to arrive at "net wages."  To the net wages, Cohen then added the value of employment benefits.   However, Cohen subtracted medical benefits, because plaintiff was still receiving them from the railroad.  Cohen also added the value of pension benefits, calculated at "a number the Railroad Retirement Board provides, times the number of years of service, times his average salary."

On cross-examination, Cohen testified that, in his calculations, he assumed that plaintiff was totally disabled, based on information received from a secretary in plaintiff's law firm. Cohen testified that he did not have any conversations with plaintiff.  Cohen also testified that the minimum wage in the United States is $5.15 per hour and that in his calculations, he had assumed that plaintiff would never earn money again in his lifetime.  For the year 2001, plaintiff's annualized wages were $33,889, which were approximately $16 per hour.  For the year 2002, Cohen assumed that plaintiff's wages would increase  69%  to $57,420, based on the

average of his coworkers. Cohen also testified that light and medium duty jobs exist both with the railroad and throughout the United States economy, and that those jobs can pay minimum wage. Cohen admitted that his calculations were only as good as his assumptions.

Plaintiff's next witness was Thomas Lally, who is employed by defendant as a terminal coordinator. Lally explained that a terminal coordinator sits in a tower and acts like a "air traffic controller but for box cars, trains." As part of his duties, he is involved in the investigation of personal injuries sustained by defendant's employees at the Proviso yard.

Lally testified that on November 12, 2001, he received a telephone call at his home at approximately 3:45 a.m. notifying him that there had been an injury in the Proviso yard. Lally eventually learned that the injured employee was plaintiff. After Lally arrived at the yard sometime later that morning, he observed the handhold that he was told was involved in the accident and noticed that "it was broken." Lally testified that the handhold should not have been "plug weld[ed]"; it should have been "bolted." After observing the photograph of the handhold presented by counsel at trial, Lally testified that the bolts had been removed and "somebody had plug welded that."

Lally testified that on November 12, he ordered the car foreman, Mike Haggerty, to perform a more detailed inspection of the car. The inspection included filling out a mechanical inspection form. Lally testified that he also spoke with plaintiff who stated "when he was climbing off, the handhold gave away, and he fell off the car, and it scared the sh-- out of him." Plaintiff told Lally that he was scared when he fell on track 29 "because he thought it was a live track." Lally testified that plaintiff had "kind of like a sprained ankle," and that Lally met

plaintiff at the hospital as plaintiff was being discharged and that plaintiff stated: "Well, I got a little pain." Lally completed two injury reports for the railroad within a day or two. One report stated: "While getting off a freight car, handhold slid out of bracket causing him to fall from car." Lally testified that, in Lally's presence and on the day of the accident, plaintiff completed a personal injury report, required by the railroad from any injured employee. Lally signed as a witness to plaintiff's signature on the report. This report stated: "While getting off the car I was holding on the grab bar. As I was swinging my body around car, the grab bar slid out and that forced me to the ground." The report stated that the accident affected his wrist, back and ankle.

Plaintiff's next witness was Michael Haggerty, who was a car supervisor with the railroad at the time of plaintiff's accident. On November 12, 2001, he was asked by the manager of mechanical maintenance to inspect a car that had been involved in an accident and to complete an accident report form. His report stated that the handhold had "minor bends," that the "end securement[s]" had been welded, and that the "end weld[s]" had broken. Haggerty also testified that the distance from the platform to the ground was approximately 40 inches.

Next plaintiff played the videotaped evidence deposition of Dr. Mark Nikkel, plaintiff's orthopaedic surgeon. Dr. Nikkel testified that he attended an osteopathic medical school, was licensed to practice medicine in Illinois and was board certified in orthopaedic surgery, which he explained was "the specialty that involves conservative operative techniques and the musculoskeletal system." Dr. Nikkel testified that when he first examined plaintiff on November 13, 2001, plaintiff provided a history that he fell, twisted his right ankle and hit his right wrist

and back on the railroad track.

Dr. Nikkel testified that he found concluded that plaintiff's right wrist had a preexisting scaphoid fracture. Dr. Nikkel testified, also with respect to plaintiff's right wrist, that plaintiff had been "previously diagnosed on 4/10/01 with deeper veins which we treated with a splint and antiinflammatories as well as therapy."

Dr. Nikkel testified that on December 4, 2001, after reviewing an "MRI" and "CT scan," he concluded that injuries resulting from the accident included bone bruises to plaintiff's right wrist and an "ostechondral lesion" on his right ankle. On December 4, Dr. Nikkel recommended physical therapy. On January 8, 2002, Dr. Nikkel felt on palpitation a "significant paraspinal spasm" in plaintiff's lower back during a clinical examination, and on January 30, 2002, plaintiff's complaints of pain included his right wrist, right ankle, shoulder and back. On February 25, 2002, Dr. Nikkel performed anthroscopic surgery on plaintiff's right ankle, and examined plaintiff again on March 6 and March 20.

Dr. Nikkel testified that on March 20, 2002, Dr. Nikkel took additional x-rays of plaintiff's right wrist due to plaintiff's complaints of pain and found the exam was "essentially unremarkable." On April 20, 2002, Dr. Nikkel concluded that plaintiff's "pain was improving to the point where I felt we could start weight bearing him and continuing his [physical] therapy." On May 8, 2002, after concluding that plaintiff was "weight-bearing *** up to 50 percent," Dr. Nikkel "continued weight-bearing increasing." On June 5, 2002, plaintiff's weight-bearing had decreased from the last visit, so Dr. Nikkel recommended a second surgery.

Dr. Nikkel testified that on July 15, 2002, he performed a second surgery on plaintiff's

right ankle, during which Dr. Nikkel broke the bone with a saw, in order to expose "the defect," which was the lesion. Then Dr. Nikkel testified that he "actually core[d] out" the lesion. Then he took a piece of cartilage from plaintiff's right knee "that fit[] into that hole" and "replace[d] the cartilage that was lost as a result of the injury." Then he repaired the broken bone "with two screws *** placed in the bone across the fracture site."

Dr. Nikkel testified that on August 15, 2002, plaintiff complained of fever and chills. Plaintiff had a wound on his right ankle, with redness around the wound, due to a postoperative infection. Dr. Nikkel admitted plaintiff back into the hospital and the infection was successfully treated during a four-day hospital stay. During office visits on August 21 and 28, Dr. Nikkel kept plaintiff's ankle non-weight bearing. By September 18, 2002, when Dr. Nikkel next examined plaintiff, physical therapy had begun. On October 9, during the next office examination, plaintiff was "25 percent" weight-bearing. By October 31, plaintiff's weight-bearing had increased to 75%. On November 26, 2002, Dr. Nikkel concluded that plaintiff's wound had healed completely and his X-rays "showed good healing."

Dr. Nikkel testified that on January 21, 2003, plaintiff denied an "antalgic gait or limping" and stated that he felt "'pretty good,'" other than "some swelling laterally, [and] some decreased range of motion" in his right ankle. After plaintiff's February 20, 2003 examination, Dr. Nikkel concluded that plaintiff "could be released from therapy," "placed on a home exercise program," and "follow up with [Dr. Nikkel] as needed." Dr. Nikkel did not expect significant changes after this date, and found that plaintiff was not able to return to work as a freight conductor.

Dr. Nikkel testified that on July 24, 2003, plaintiff returned "complaining primarily of the incision line." Dr. Nikkel "felt that his pain was primarily due to the hardware site" and discussed the possibility of removing it. Dr. Nikkel testified that X-rays taken on August 24, 2003 showed "really good healing." On August 27, 2003, plaintiff returned with complaints of ankle pain, chills and a fever. The exam revealed no signs of infection and "minimal, if any, swelling." Dr. Nikkel prescribed an antiinflammatory medication and physical therapy. Approximately six months later, during the next visit on March 18, 2004, plaintiff complained of tenderness over the incision line. Dr. Nikkel again prescribed antiinflammatory and pain medication. On June 29, 2004, plaintiff complained about his right elbow, for which Dr. Nikkel gave him an armband and prescribed additional antiinflammatory medication.

Dr. Nikkel testified that on June 29, 2004, he told plaintiff to return in a month. Plaintiff did not return until January 13, 2005, almost seven months later, complaining of "a fever" in the area of the incision. Dr. Nikkel testified that "again" the X-rays were "unremarkable" and the physical exam showed no signs of infection," and "again" Dr. Nikkel discussed the possibility of removing the screws in plaintiff's ankle. Dr. Nikkel again prescribed an antiinflammatory medication and physical therapy.

Dr. Nikkel testified that the next time he examined plaintiff was over a year later, on March 8, 2006. Plaintiff complained of pain in his right ankle and lower back. Dr. Nikkel prescribed an antiinflammatory medication and physical therapy. Seven months later, on October 17, 2006, plaintiff returned with complaints of right ankle and low back pain. Concluding his direct examination, Dr. Nikkel testified that he did not expect any substantial

14

improvement and that plaintiff was permanently disabled from his job as a railroad freight conductor.

On cross-examination, Dr. Nikkel testified that plaintiff's most significant injury was the lesion on his right ankle and that plaintiff had told Dr. Nikkel of a prior ankle injury. Dr. Nikkel testified that his "expectation" was that the second surgery in July 2002 would "get him back to work." The expected outcome included that plaintiff would be walking without a cane. On October 9, 2002, Dr. Nikkel noted that plaintiff was "doing quite well," his wound was healing well and plaintiff was not having any pain with weight-bearing. During that examination, plaintiff informed the doctor that he was suing the railroad. In November 2002, plaintiff was full weight-bearing and his wound had healed completely. During a visit on January 21, 2003, plaintiff told Dr. Nikkel that he had no interest in returning to work for the railroad.

On cross, Dr. Nikkel testified that he ordered a functional capacity evaluation (FCE) that was done on February 14, 2003. The purpose of the FCE was to determine at what level plaintiff could return to work. The report concluded that plaintiff's reports of pain were inconsistent with his behavior and movement patterns, and that the inconsistency indicated pain and disability out of proportion to the actual impairment. Dr. Nikkel testified that it was his opinion, within a reasonable degree of medical certainty, that plaintiff could work so long as his employment had limits consistent with the findings in the FCE. The FCE indicated that plaintiff was capable of a "medium" level job. Dr. Nikkel could not find any objective findings that confirmed plaintiff's subjective complaints of pain.

Plaintiff's last witness was plaintiff's wife, Stacey Dixon, who substantially corroborated

15

No. 1-07-2123

plaintiff's testimony.

On March 22, 2007, after plaintiff rested, defendant moved for a directed verdict on the issue of plaintiff's future wage losses, which was denied, and plaintiff moved for "a directed finding"[1] on defendant's violation of the Safety Appliance Act (49 U.S.C. §20301 et seq. (2000)), which was granted. Plaintiff also moved for "a directed finding" on defendant's affirmative defense of failure to mitigate damages. Relying specifically on the First District cases of Mikus v. Norfolk & Western Ry. Co., 312 Ill. App. 3d 11 (2000), and Brown v. Chicago & North Western Transportation. Co., 162 Ill. App. 3d 926 (1987), the trial court orally ruled that there was "sufficient" evidence that the mitigation issue "should go to the jury."

Also on March 22, 2007, there was an extensive discussion among the trial court and counsel concerning the proper wording of the jury instruction on mitigation. At the end of the day, the trial court asked counsel to try "to come up with something" and e-mail it to the court. The next day, March 23, at approximately 9:30 a.m., the trial court noted for the record:

> "THE COURT: On the record. We've had informal
>
> discussion regarding the Court's submitted instruction on
>
> mitigation of damages that is a highbred of Brown, Norfolk cases,
>
> the Bender's forms and the Federal Jury Practice Rules and both

---

[1]Plaintiff labeled his motions as motions for "a directed finding." Normally, a directed finding occurs in a bench trial (735 ILCS 5/2-1110 (West 2006)), and a directed verdict occurs in a jury trial (735 ILCS 5/2-1202 (West 2006)).

16

sides have agreed.    Am I correct?  Speak up.

MR. FARINA (plaintiff's counsel): Yes.  Yes, Your Honor.

MR. CUSHING (defense counsel): Yes, Judge."

At trial, during closing argument, both parties made significant concessions.  Defendant conceded: (1) that the handrail came loose; (2) that plaintiff fell; and (3) that plaintiff was not physically able to resume his job as a freight railroad conductor.  During closing, plaintiff did not dispute that he had made no attempts to look for work.  Although plaintiff's counsel observed that defendant "scream[ed] to high heaven" that plaintiff "didn't even try to get a new job," plaintiff's counsel did not claim that he had looked.  Instead, plaintiff claimed that "the interplay between the physical and psychological injuries" left plaintiff totally disabled.

During closing, plaintiff asked the jury for a total of over $2 million:   $1,567, 535 for lost wages; $450,000 for pain and suffering; and $375,000 for disability.  By contrast, defendant asked the jury to return: $51,000 for lost wages; and $150,00 to $200, 000 for pain and suffering.

As part of its jury instructions, the trial court informed the jury that it had already ruled that defendant violated the Safety Appliance Act.  The trial court instructed the jury to find for plaintiff if it found that plaintiff had satisfied his burden of proving:  (1) that he was injured during his employment with the railroad; and (2) that his injury resulted in whole or in part from defendant's violation of the Safety Appliance Act.  If the jury found for plaintiff, then it had to determine the amount of damages that would compensate him for the following elements if these elements were "proved by the evidence to have resulted from the conduct of the defendant." Those elements were: (1) disability; (2) pain and suffering; and (3) lost earnings and benefits.

With respect to mitigation, the trial court instructed the jury "if you find that the defendant proved that the plaintiff within the limitation of any disability he may have sustained failed to resume gainful employment as soon as it was reasonably available under the circumstances shown in the evidence, then you should reduce the amount of the plaintiff's damages by the amount the plaintiff could have reasonably realized if the plaintiff had resumed gainful employment."

On March 23, 2007, the jury returned a verdict for plaintiff and awarded $0 for disability, $131, 318.66 for pain and suffering, and $54,500 for lost earnings. On April 20, 2007, plaintiff filed a posttrial motion requesting a new trial solely on damages, on the grounds that the trial court erred by giving a jury instruction concerning mitigation and that the verdict awarding nothing for disability and $54, 500 for lost earning was against the manifest weight of the evidence. On July 19, 2007, the trial court orally stated that it denied the "motion for new trial based on the record of the evidence, the arguments made, and the law, and *** incorporating said evidence and all the rulings I made at the trial." The written order, dated July 19, 2007, stated that: "Plaintiff's Post-Trial Motion is denied for the reasons stated on the record. This is a final and appealable order."

On July 30, 2007, plaintiff filed a notice of appeal asking this court: (1) to reverse the judgment entered on March 23, 2007 upon the verdict; (2) to reverse the order, dated July 19, 2007, denying plaintiff's posttrial motion; and (3) to remand for a new trial on damages only, or in the alternative, to remand for a new trial on all issues.

ANALYSIS

18

On appeal, plaintiff claims: (1) that the trial court erred by giving a jury instruction concerning plaintiff's alleged failure to mitigate damages; and (2) that the jury verdict awarding nothing for disability and $54, 500 for lost earnings was against the manifest weight of the evidence.

Mitigation Instruction

Under the Federal Employers' Liability Act (FELA), plaintiff had a duty to mitigate damages and to secure gainful employment within a reasonable time after his injury. Mikus, 312 Ill. App. 3d at 28 (discussing FELA (45 U.S.C. §51 through 60 (2000)).

In general, a reviewing court will reverse a trial court's ruling about a jury instruction, only if the trial court committed a clear abuse of its discretion. Stift v. Lizzadro, 362 Ill. App. 3d 1019, 1025-26 (2005). The question of whether the evidence at trial raised an issue, thus requiring a particular jury instruction, is within the sound discretion of the trial court. LaFever v. Kemlite Co., 185 Ill. 2d 380, 406 (1998). Specifically, with respect to mitigation under the FELA, this court has held that a trial court's decision whether to give a mitigation instruction is subject to an abuse-of-discretion standard. Mikus, 312 Ill. App. 3d at 25.

In general, a party has a right to have a trial court instruct the jury about any theory supported by the record. LaFever, 185 Ill. 2d at 406; Snelson v. Kamm, 204 Ill. 2d 1, 27 (2003). Specifically, with respect to mitigation in an FELA case, this court has held that a defendant is entitled to a jury instruction about mitigation if there is evidence in the record to support it. Brown, 162 Ill. App. 3d at 932, Mikus, 312 Ill. App. 3d at 30.

" ' "All that is required to justify the giving of an instruction is that there be some

19

evidence in the record to justify the theory of the instruction" ' [citations.]" LaFever, 185 Ill. 2d at 406; Stift, 362 Ill. App. 3d at 1026; Mikus, 312 Ill. App. 3d at 33. The trial court does not have to be persuaded by the evidence or think that the jury will be. LaFever, 185 Ill. 2d at 406-07; Snelson, 204 Ill. 2d at 27 (evidence may be slight). "The quantum of proof necessary to prevail on a claim is different *** from the measure of evidence needed merely to send an issue to the jury." (Emphasis in original.) LaFever, 185 Ill. 2d at 407. While the "some evidence" threshold is low, the evidence cannot be untrustworthy and must be "grounded in more than mere possibilities." LaFever, 185 Ill. 2d at 408; Mikus, 312 Ill. App. 3d at 33 (the "some evidence" standard described in LaFever is a "modest" threshold).

Thus, to receive a jury instruction on the mitigation issue, defendant had the burden of pointing to some evidence in the record to support its mitigation theory. On March 19 and 20, 2007, during pretrial argument on plaintiff's motion in limine to bar the mitigation issue at trial, defense counsel pointed to the following evidence: the report of plaintiff's own treating physician stating that plaintiff could perform a "medium" duty job. Defendant's counsel added that he intended to ask plaintiff's economist what the minimum wage was and how much a person would earn at a minimum wage job. After argument, the trial court denied plaintiff's motion.

On March 22, the trial court revisited the issue again, at the close of evidence, when plaintiff moved for "a directed finding" on the mitigation issue. Plaintiff's counsel conceded that defendant had "offered some evidence that plaintiff is capable of working somewhere else." However, plaintiff argued that this "some evidence" was insufficient because defendant failed to

offer evidence concerning "what those jobs are" or "what those jobs pay."

In response, defense counsel pointed to the following evidence: (1) trial testimony by plaintiff's treating physician and orthopaedic surgeon, Dr. Mark Nikkel, that plaintiff could work at a medium-level job; (2) trial testimony by Dr. Nikkel that plaintiff admitted that he had no interest in returning to work for the railroad; (3) plaintiff's trial testimony that he had not worked since the day of the accident; (4) trial testimony by Dr. Malcolm Cohen, an economic expert retained by plaintiff, that the minimum wage in the United States is $5.15 per hour and that Dr. Cohen is aware that there are medium-and light-duty jobs throughout the United States economy and that these jobs can pay minimum wage; and (5) trial testimony by Nancy Milnes, a licensed clinical social worker who treated plaintiff for psychological issues, that her opinion that plaintiff could not work was formed when she last saw him in March 2004 and that this was not a permanent opinion.

The trial court did not abuse its discretion when, relying on both the above-cited evidence and this court's opinions in Brown and Mikus, it decided to give a mitigation instruction. Brown, 162 Ill. App. 3d at 932-34; Mikus, 312 Ill. App. 3d at 30-33. In Brown and Mikus, this court reviewed the same issue that was before the trial court in this case, namely, whether to give a mitigation instruction in an FELA case. Brown, 162 Ill. App. 3d at 932-34; Mikus, 312 Ill. App. 3d at 30-33. In both Brown and Mikus, this court reversed because the trial court failed to give a mitigation instruction. Brown, 162 Ill. App. 3d at 934; Mikus, 312 Ill. App. 3d at 31. In Brown, we reversed because the record contained evidence "from which a jury might reasonably conclude that [plaintiff] Brown was indifferent to finding alternative employment." Brown, 162

21

Ill. App. 3d at 932.

As in Brown, the record before us contains evidence from which a jury might reasonably conclude that plaintiff was indifferent to finding alternative employment. The record in the case at bar included: plaintiff's own testimony that he had not worked since the accident; testimony from his own treating physician that plaintiff was capable of light -, to medium-duty work but had no interest in returning to work for the railroad; and no evidence that plaintiff had tried to find any work. From this record, a jury had sufficient evidence to conclude, as it had in the Brown case, that plaintiff was indifferent to finding alternative employment.

In Mikus, this court also reversed because of a trial court's failure to give a mitigation instruction. Mikus, 312 Ill. App. 3d at 31. The record in Mikus justified a mitigation instruction, where the evidence included: plaintiff's testimony that he had not worked or sought work since the accident and had not sought treatment in the two years prior to trial; and medical testimony that plaintiff could resume employment with certain lifting and movement restrictions. Mikus, 312 Ill. App. 3d at 30-31. Similarly, in the case at bar, plaintiff has not worked since the accident, even though his treating physician concluded several years prior to trial that he could work in a medium-level job.

On appeal, plaintiff tries to distinguish both Brown and Mikus. Plaintiff tries to distinguish Brown, because in Brown, plaintiff refused to cooperate with defendant's efforts to provide rehabilitation and retraining. Brown, 162 Ill. App. 3d at 932-33. However, in Brown, the thing that required the mitigation instruction was plaintiff's indifference to his duty to mitigate. Brown, 162 Ill. App. 3d at 932-33. Lack of cooperation is just one way in which a

22

plaintiff can manifest an indifference to his duty to mitigate; it is not the only way.

Plaintiff tries to distinguish Mikus, because in Mikus, defendant offered plaintiff another job. Mikus, 312 Ill. App. 3d at 29. However, the trial court in Mikus excluded evidence of defendant's job offer. Mikus, 312 Ill. App. 3d at 29-30. Thus, when this court on appeal reviewed the trial court's decision not to give a mitigation instruction, we analyzed the trial record as it stood – without the evidence of the job offer. Mikus, 312 Ill. App. 3d at 30. We held that, even though the trial court erroneously excluded evidence of defendant's offer and rehabilitation efforts, the "other evidence in the record" still required a mitigation instruction. Mikus, 312 Ill. App. 3d at 30. Thus, plaintiff's attempt to distinguish Milks based on the job offer is disingenuous.

At oral argument before the trial court, plaintiff argued that the evidence cited by defendant was insufficient for a mitigation instruction, because defendant did not offer evidence about "specific" alternative employment. Plaintiff's attorney stated: "They didn't mention one specific single job that anyone admitted the plaintiff was qualified to do, let alone whether it was full or part-time, let alone what benefits that job had, let alone what that job paid."

This same argument was rejected by this court in Brown, 162 Ill. App. at 932-33. Like the plaintiff in our case, the plaintiff in Brown, also an injured railroad employee, claimed that the record did not justify a mitigation instruction, because defendant railroad did not "produce any evidence of available employment that Brown had the ability to perform." Brown, 162 Ill. App. 3d at 932. In Brown, we rejected this argument that, in order to obtain a mitigation instruction, a defendant was required to produce evidence of "other jobs available to [plaintiff]."

23

Brown, 162 Ill. App. 3d at 933. Thus, in the case before us, the lack of evidence about specific, available jobs did not bar a mitigation instruction. C.f. Richardson v. Chapman, 175 Ill. 2d 98, 112 (1997) (jury has "leeway" to award damages for future medical expenses, even when the expenses are not "specifically itemized in the testimony"); Dillon v. Evanston Hospital, 199 Ill. 2d 483, 504 (2002) (jury may award damages for increased risk of future injury, even when future injury is "not reasonably certain to occur").

On appeal, in support of this argument, plaintiff cites the Tenth Circuit case of Wilson v. Union Pacific R.R. Co., 56 F.3d 1226 (10th. Cir. 1995). In Wilson, the Tenth Circuit held that a mitigation instruction was not required where there was no evidence that plaintiff "was physically able to look for work or that appropriate jobs existed." Wilson, 56 F.3d at 1232. By contrast, in the case at bar, there was evidence both that plaintiff was physically able to perform light - to medium-level jobs and that such jobs existed.

In sum, we cannot find that the trial court abused its discretion in giving a mitigation instruction when it relied on this court's prior case law and the evidence in the record cited by the defendant.

Jury Verdict

On appeal, plaintiff seeks a new trial solely on damages, claiming that the jury's verdict of $54,500 for economic loss and $0 for disability was against the manifest weight of the evidence. Plaintiff asserted this same claim in a posttrial motion that the trial court denied.

A reviewing court will reverse a trial court's ruling on a posttrial motion for a new trial, only if the trial court abused its discretion. Snover v. McGraw, 172 Ill. 2d 438, 449 (1996);

24

Snelson, 204 Ill. 2d at 36. Our supreme court has held that a court can upset a jury's award of damages only if it finds that: (1) the jury ignored a proven element of damages; or (2) the verdict resulted from passion or prejudice; or (3) the award bore no reasonable relationship to the loss. Snover, 172 Ill. 2d at 447, quoting Gill v. Foster, 157 Ill. 2d 304, 315 (1993); Snelson, 204 Ill. 2d at 37. Our supreme court has emphasized that a jury's award of damages is entitled to substantial deference by the court. Snover, 172 Ill. 2d at 447; Snelson, 204 Ill. 2d at 36-37. The determination of damages is a question of fact, not of law, and thus within the discretion of the jury, not the court. Snelson, 204 Ill. 2d at 36 ("Illinois courts have repeatedly held that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine***").

Plaintiff asks us to reverse because: (1) the zero award for disability ignored "'a proven element of damages,'" namely, the physical disability that defendant conceded prevents plaintiff from returning to work at his old job as a freight conductor; and (2) the award for economic loss bore "'no reasonable relationship to the loss,'" because defendant's evidence of plaintiff's failure to mitigate was based on speculation and conjecture. Snover, 172 Ill. 2d at 447, quoting Gill, 157 Ill. 2d at 315.

Zero Award for Disability

With respect to plaintiff's first claim, defendant conceded in its closing argument that plaintiff could not resume his prior employment as a freight railroad conductor:

> "There is no dispute in this case that Dr. Nikkel, his treater, has
>
> said, Mr. Dixon, you cannot go back to work as a conductor. We
>
> don't dispute it. That's the facts, that's the truth. I mean Dr.

Nikkel testified to it. He's his treater. Because they have to do

heavy lifting, they have to be on uneven ballast. They have to do a

number of things that Dr. Nikkel did not believe would be

appropriate for Mr. Dixon to do based on his medical training.

There's no dispute in this case."

Since defendant thus conceded some level of physical disability, the issue for the jury was what were the appropriate damages for the level of disability that the jury found.

As noted above, we can overturn the jury's award only if the jury ignored an element of damages, acted out of passion or prejudice, or made an award not reasonably related to loss. Snover, 172 Ill. 2d at 447. First, the fact that the jury chose to award zero for disability while awarding something for pain, suffering and economic loss is not proof, by itself, that the jury 'ignored' that element. White v. Lueth, 283 Ill. App. 3d 714, 718 (1996) (upheld jury award of nothing for disability, although jury awarded damages for medical expenses, and pain and suffering). See also Snover, 172 Ill. 2d at 447-48 (upheld jury award of nothing for pain and suffering, although jury awarded damages for pain-related medical expenses); Stift, 362 Ill. App. 3d at 1021 (upheld jury award of nothing for loss of normal life, although jury awarded damages for medical expenses, and pain and suffering); Orava v. Plunkett Furniture Co., 297 Ill. App. 3d 635, 636 (1998) (upheld jury award of nothing for disability, lost salary, and pain and suffering, although jury awarded damages for medical expenses and aggravation of preexisting condition); Zuder v. Gibson, 288 Ill. App. 3d 329 (1997) (upheld jury award of nothing for disfigurement and loss of normal life, although jury awarded damages for medical expenses, and pain and

26

suffering). Second, plaintiff does not claim that the jury acted out of passion or prejudice.

Thus, the issue with respect to the zero award comes down to the third prong of the test: was it "reasonably related" to the physical disability that prevented plaintiff from returning to work at his old job. Snover, 172 Ill. 2d at 447. When evaluating reasonable relationship, we must keep in mind that disability is separate and distinct from either lost earnings or pain and suffering. Unlike economic damages, such as loss of earnings or medical expenses, a disability award is "not as readily as calculable in money and jurors must draw on their real life experiences in making an award." Snover, 172 Ill. 2d at 448-49 (discussing pain and suffering).

The record permitted the jury to conclude that plaintiff was not totally disabled currently and would not be in the future. The uncontroverted testimony of plaintiff's treating physician was that plaintiff had the ability to perform light - to medium-level jobs. Based on a functional capacity evaluation (FCE) completed in February 2003, Dr. Nikkel testified that plaintiff's reports of pain were inconsistent with his behavior and movement patterns. The FCE concluded that plaintiff's reports of pain and disability were "out of proportion to the impairment." Dr. Nikkel testified that the expected outcome of this type of surgery, considering plaintiff's age and type of injury, was that plaintiff would be working full-time without complaints of pain. Although plaintiff was walking with a cane, Dr. Nikkel testified that this also was not an expected outcome. Dr. Nikkel was not aware of any objective findings or test results that confirmed plaintiff's subjective complaints of pain. Snover, 172 Ill. 2d at 449 (when evaluating a damages award, "the trial court should consider the distinction between subjective complaints of injury and objective symptoms"); Orava, 297 Ill. App. 3d at 637-38 (jury was entitled to

27

discount much of plaintiff's testimony where "plaintiff's treating doctors *** found no objective signs of injury that correlated with her various complaints of pain").

From Dr. Nikkel's testimony, the jury was free to draw reasonable inferences about plaintiff's physical ability to perform tasks in his daily life, both currently and in the future. Although both plaintiff and his wife testified about the restrictions in plaintiff's normal life, the jury was free to make its own credibility determinations and reject or accept their testimony. Stift, 362 Ill. App. 3d at 1029 (where evidence is "merely based on the subjective testimony of the plaintiff, a jury is free to disbelieve it"); Snover, 172 Ill. 2d at 448 ("The jury determines the credibility of witnesses and the weight to be given their testimony").

However, the uncontroverted evidence was that plaintiff was disabled for a certain period of time after the accident. Both plaintiff and his wife testified about limitations occurring during the period after the accident on November 11, 2001, the surgeries on February 25 and July 15, 2002, and the four-day hospital stay starting on August 15, 2002. Dr. Nikkel testified about periods of time after each of these events during which he kept plaintiff's right ankle not "weight- bearing." Dr. Nikkel testified that it was not until November 2002 that he observed complete healing of the wound that had led to plaintiff's hospital stay. It was also not until November 2002 that Dr. Nikkel found plaintiff's right ankle to be fully weight-bearing. On December 9, 2002, Ms. Milnes, plaintiff's therapist, completed a disability determination report for the social security administration, in which she concluded that plaintiff was unable to return to work.

During closing argument, defendant argued that February 14, 2003, the date of the FCE,

28

marked the day that plaintiff was no longer disabled for work return.[2] Even if one used the February 2003 benchmark sought by defendant, that still results in a period of disability of over a year. Thus, the jury verdict awarding nothing for disability ignored a proven element of damages and must be vacated. Snover, 172 Ill. 2d at 447, quoting Gil v. Foster, 157 Ill. 2d 304, 315 (1993); Snelson, 204 Ill. 2d at 37.

In remanding for a new trial on just one element of damages, we follow the precedent set by our supreme court in Dillon v. Evanston Hospital, 199 Ill. 2d 483 (2002). In Dillon, the jury awarded plaintiff $1.5 million for past pain and suffering, $1.5 million for future pain and suffering, and $500,000 for the increased risk of future injuries. Dillon, 199 Ill. 2d at 489. Finding that the jury instruction on increased risk was not proper, our supreme court "remand[ed] the cause to the trial court for a new trial solely on that element of damages." Dillon, 199 Ill. 2d at 508. Similarly, we remand for a new trial solely on the disability element of damages.

Award for Economic Loss

Next, plaintiff seeks reversal of the $54,500 award for lost earnings solely because the "evidence on plaintiff's failure to mitigate was based on improper speculation and conjecture." As already discussed above in this opinion's section on mitigation, the issue of mitigation was properly submitted to the jury. The evidence of plaintiff's failure to mitigate was based on more than speculation and conjecture. It included testimony by plaintiff's doctor that he could work at

---

[2]In closing, defendant's counsel stated, "So February 14, Valentine's Day of '03 *** [t]hat's the point where Mr. Dixon should go start looking for a job."

a medium-level job; and testimony by plaintiff's economic expert that medium- to light-duty jobs are available in the United States and that these jobs can pay minimum wage, which is $5.15 an hour. Thus plaintiff's argument is not persuasive.

In sum, we find that the trial court did not abuse its discretion when it refused to vacate the jury award for economic loss.

CONCLUSION

For the reasons discussed above, we find that the trial court did not abuse its discretion when it decided to give a mitigation instruction, or when it refused to vacate the jury award for economic loss. However, we find that the trial court did abuse its discretion when it refused to vacate the jury award with respect to disability. Thus, we remand for a new trial solely on the issue of damages for disability.

Reversed and remanded with instructions.

CAHILL, P.J., and WOLFSON, J., concur.

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
## (Front Sheet to be attached to each Opinion)

**Please use the following form:**

**OSBY DIXON,**

**Plaintiff-Appellant,**

**v.**

**UNION PACIFIC RAILROAD CO.,**

**Defendant-Appellee.**

**Complete TITLE of Case.**

**Docket No.**    No. 1-07-2123

**COURT**    Appellate Court of Illinois
First District, First Division

**Opinion Filed**    JUNE 09, 2008
(Month, Day and Year)

**JUSTICES**    JUSTICE ROBERT E. GORDON delivered the opinion of the court.

CAHILL, P.J., and WOLFSON, J., concur.

**APPEAL from the Circuit Court of Cook County; the Hon:_____ Judge Presiding**    Lower Court and Trial Judge(s) in form indicated in margin:

Appeal from the Circuit Court of Cook County.

Honorable Ralph Reyna, Judge Presiding.

**For APPELLANTS John Doe of Chicago.**    Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel.

**For APPELLEES,**    Indicate the word NONE if not represented.

--------------

**Smith and Smith, of Chicago.**

**Brown, of Counsel.**

Hoey & Farina
Chicago, Illinois   60605
Attorneys for Plaintiff-Appellant - Osby Dixon
Attn: James L. Farina and Steven P. Garmisa

<pre>
                    ]          OF COUNSEL
                    ]
Also add atty.      ]
for third party     ]     Union Pacific Railroad Company
appellants          ]     Chicago, Illinois   60606
or appellees.       ]     Attorneys for Defendant-Appellee - Union Pacific
                              Railroad Company
                    ]     Attn: Thomas W. Cushing
                    ]          OF COUNSEL
                    ]
</pre>

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ (U S E    R E V E R S E    S I D E    I F    NEEDED_____