# Illinois Official Reports

## Appellate Court

*Doe v. University of Chicago Medical Center*, 2014 IL App (1st) 121593

| | |
|---|---|
| Appellate Court Caption | JANE DOE, Plaintiff-Appellant, v. THE UNIVERSITY OF CHICAGO MEDICAL CENTER, a Not-For-Profit Corporation, Formerly Known as The University of Chicago Hospitals, Defendant-Appellee (James Richard Thistlethwaite, Jr., M.D., Defendant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-1593 |
| Filed<br>Rehearing denied | September 12, 2014<br>November 17, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The jury verdict for defendant medical center in a medical malpractice case was reversed and the cause was remanded for a new trial, where plaintiff became infected with HIV after receiving a kidney transplanted from a donor who tested negative for HIV infection but was considered a high-risk donor, and although the jury was given plaintiff's correct instruction that defendant medical center was responsible for the conduct of both the nurse coordinator and the transplant surgeon with respect to obtaining plaintiff's informed consent to the risks involved in the transplant, the trial court also gave the medical center's misleading instruction that the jury could only consider the acts of the transplant surgeon in determining whether the medical center could be found liable for plaintiff's injury, and under the circumstances, plaintiff's correct instruction did not cure the error arising from the medical center's misleading instruction and the error resulted in serious prejudice to plaintiff, especially when the jury could have reached a different verdict in the absence of the error. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-12783; the Hon. Thomas L. Hogan, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal     Thomas A. Demetrio, of Corboy & Demetrio, P.C., of Chicago, and Michael T. Reagan, of Ottawa, for appellant.

William V. Johnson, Matthew L. Johnson, Garrett L. Boehm, Jr., and Erin E. Blake, all of Johnson & Bell, of Chicago, for appellee.

Panel     JUSTICE HALL delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Lampkin specially concurred, with opinion.

**OPINION**

¶ 1 The plaintiff, Jane Doe, filed a medical malpractice lawsuit against the defendants, the University of Chicago Medical Center (the UCMC) and James Richard Thistlethwaite, Jr., M.D. Prior to trial, the plaintiff voluntarily dismissed Dr. Thistlethwaite from the lawsuit. Following a jury trial, a judgment was entered in favor of the UCMC and against the plaintiff. The trial court denied the plaintiff's motion for a new trial. The plaintiff appeals.

¶ 2 On appeal, the plaintiff raises the following issues: (1) whether the jury instructions denied her a fair trial; (2) whether the jury verdict and the answers to the special interrogatories were against the manifest weight of the evidence; and (3) whether the cumulative effect of the instances of improper argument by the UCMC denied her a fair trial.

¶ 3 For the reasons set forth below, we reverse the judgment of the trial court and remand this case for a new trial.

¶ 4 BACKGROUND

¶ 5 In 1984, Congress established the Organ Procurement and Transplantation Network (OPTN), which provided for the creation of a network to be operated by a private not-for-profit organization under a federal contract. In 1986, the United Network for Organ Sharing (UNOS) was selected to be the contractor. The UNOS supervises organ procurement organizations (OPOs). The Gift of Hope in this case is an OPO.

¶ 6 I. HIV Transmission in Organ/Tissue Transplantation Procedures

¶ 7 In 1994, the Center for Disease Control (CDC) published "Guidelines for Preventing Transmission of Human Immunodeficiency Virus [(HIV)] Through Transplantation of Human Tissue and Organs." The guidelines provided in pertinent part as follows:

"Regardless of their HIV antibody test results, persons who meet any of the criteria listed below should be excluded from donation of organs or tissues unless the risk to the recipient of not performing the transplant is deemed to be greater than the risk of HIV transmission and disease (e.g., emergent, life-threatening illness requiring transplantation when no other organs/tissues are available and no other lifesaving

therapies exist). In such a case, informed consent regarding the possibility of HIV transmission should be obtained from the recipient." Center for Disease Control, Martha F. Rogers, M.D., *et al.*, Guidelines for Preventing Transmission of Human Immunodeficiency Virus Through Transplantation of Human Tissue and Organs (May 20, 1994), *available at* http://cdc.gov. (hereinafter, CDC guidelines).

¶ 8 In the 1994 CDC guidelines, the behavior/history criteria included "[m]en who have had sex with another man in the preceding 5 years." *Id.* By 1996, the CDC guidelines, which reflected the CDC's safety goals, were being interpreted in such a way so as to further compromise the already limited supply of human organs. Seeking to clarify the guidelines, the CDC stated:

> "[W]hen a potential organ donor tests HIV-antibody negative but has behavioral risk factors for HIV infection, the decision to accept an organ for transplantation should be made after consideration of the relevant risk factors for the individual recipient and with recognition of the very low incidence of HIV transmission in such situations. CDC recognizes the need for transplant centers, not organ procurement organizations, to deal with matters of patient consent in this setting.
>
>  In accepting an organ for transplantation, transplant teams should assess immediately the medical and social information available from the organ procurement organization regarding the potential donor. In the context of the current organ shortage, transplant teams are encouraged to accept and transplant organs from medically appropriate donors who test HIV-antibody negative but have behavioral risk criteria for HIV infection after the transplant teams have discussed the risks and benefits with potential recipients and/or their families." Clarification of Human Immunodeficiency Virus Screening Practices for Organ Donors, 61 Fed. Reg. 56,548, 56,549 (Nov. 1, 1996).

¶ 9         II. Pretrial Proceedings

¶ 10 On November 17, 2008, the plaintiff filed a complaint against the UCMC and Dr. Thistlethwaite alleging medical negligence relating to a kidney transplant she underwent in 2007. In count I of her amended complaint, the plaintiff alleged institutional negligence on the part of the UCMC in that she was not informed of the high-risk behavior of the donor of the kidney she received. In count II, the plaintiff alleged that Dr. Thistlethwaite was an employee or agent of the UCMC and that he failed to inform the plaintiff of the risks of accepting a kidney from a high-risk donor. Prior to trial, the plaintiff voluntarily dismissed count I of the amended complaint, and she dismissed Dr. Thistlethwaite as a defendant from count II of the amended complaint. The case was tried on count II and only against the UCMC.

¶ 11         III. Jury Trial

¶ 12 The disputed issue at trial was whether the UCMC complied with the standard of care governing informed consent in organ transplant cases. The testimony pertinent to that issue is set forth below.

## A. Testimony

### 1. *The Plaintiff*

¶ 15    On January 7, 2007, the plaintiff received a telephone call from nurse Katrina Harmon, the UCMC's kidney transplant coordinator advising her of a potential kidney match. Shortly before 10 p.m., the plaintiff received another call from nurse Harmon, informing her that the kidney matched and instructing her to proceed to the UCMC to be admitted. The transplant was performed by Dr. Thistlethwaite on January 9, 2007, and the plaintiff was discharged from the UCMC on January 14, 2007.

¶ 16    On November 1, 2007, the plaintiff received a call from Dr. Robert Harland requesting that she come to the UCMC to be tested for HIV and hepatitis C. At the hospital, she met with Dr. Harland and Dr. Thistlethwaite. Upon learning that the kidney donor was a 30-year-old male homosexual, the plaintiff stated that, had she known the donor was homosexual, she would have refused the kidney. Dr. Thistlethwaite stated that he did not know the donor was homosexual. When the plaintiff asked why she had not been informed, Dr. Thistlethwaite responded that he was unaware that she had not received that information.

¶ 17    The plaintiff had declined two previous kidney transplants where the donors' medical histories indicated unsafe sexual practices, drug use or other lifestyle choices that may have impacted their health. At the time of the 2007 transplant, she was doing well on dialysis. The plaintiff was unaware that she was 38 on the transplant list at the time of the 2007 transplant. Subsequently, the plaintiff was diagnosed with HIV and hepatitis C.

¶ 18    The plaintiff was treated at the UCMC in December 2007, and January 2008. By April 2008, the plaintiff's body was rejecting the donated kidney, and she went back on dialysis. In July 2008, the kidney was removed. From that time on, the plaintiff had less energy and suffered from a lack of interest in life. While the plaintiff hoped to receive another kidney, she was concerned that she would receive one that compromised the medication she took for HIV and hepatitis C.

¶ 19    The plaintiff would have refused a kidney from a homosexual donor even if she had known that in 20 years, HIV had never been transmitted via a kidney transplant where the donor tested negative for HIV. She would not have accepted a kidney from such a donor even knowing that her risk of dying in the next year while on dialysis was 1 in 5 as opposed to 1 in 11,000, if she accepted the kidney. However, the plaintiff then acknowledged that if she knew her chances of dying while on dialysis were much greater than the risk of contracting HIV from the donor kidney, she would have accepted the kidney.

¶ 20    When the plaintiff entered the UCMC's transplant program in 2000, she received an orientation from both a nurse coordinator and a surgeon and understood what high-risk donor meant. In 2003 and 2005, when a kidney was available, the plaintiff received the information about the lifestyles of the donors from Kathy Davis, a nurse coordinator at the UCMC. However, in 2007, she did not receive any donor-lifestyle information from nurse Harmon. The plaintiff did not ask nurse Harmon about the donor's lifestyle because on other occasions the nurse coordinator had provided the information to her.

## 2. *James Richard Thistlethwaite, Jr., M.D.*

¶ 22    Dr. Thistlethwaite was employed by the UCMC as a transplant surgeon. He served on several medical boards and had been a councilor with the UNOS. The doctor had published over 200 articles. He co-authored a 2006 article entitled, "Shared decision making in deceased-donor transplantation." Dr. Thistlethwaite agreed that the goal of informed consent included disclosure of relevant information to and comprehension by the patient. He further agreed that the protocol at the UCMC in 2007 was that potential organ recipients should be informed of the high-risk status of the donor and that the donor in this case was high risk.

¶ 23    Dr. Thistlethwaite explained that "informed consent" was a process that continues over the entire time the patient interacts with the transplant team. While the process of informed consent was under the direction of the surgeon performing the procedure, it was the customary practice at the UCMC for the nurse coordinator to inform the potential recipient that the donor was high risk. The doctor acknowledged that there was no documentation in the medical records that the plaintiff was advised of the donor's high-risk status. However, the doctor was certain that at the time he performed the plaintiff's transplant surgery, he was aware that the donor was CDC high risk.

¶ 24    In 1996, Dr. Thistlethwaite was active with the Gift of Hope. After the CDC issued its 1994 guidelines and 1996 amended guidelines, the Gift of Hope adopted the CDC guidelines for providing information as to the high-risk status of donors to the hospitals to which it supplied organs. In 2004, the OPTN adopted a rule requiring OPOs to supply that information to hospitals. However, the regulation did not require that the information be given to the potential recipient of a donor organ. Dr. Thistlethwaite explained that "if the UNOS had wanted to, they could have easily said you have to inform patients, and then it would have been a regulation. You have to inform patients if it's a high-risk donor. They chose not to do that." Even so, Dr. Thistlethwaite maintained that it was the practice at the UCMC that the patient be informed of the high-risk status of the donor and as the surgeon it was his responsibility to make sure that the patient received the information. In 2007, the doctor was not required to know whether a patient had previously turned down a kidney; in retrospect, he wished he had known it in this case.

¶ 25    While Dr. Thistlethwaite stated that all the doctors on the transplant team followed the same procedure, he did not dispute that Dr. Harland, who had been part of the UCMC's transplant team, believed that, as the surgeon, he should have the informed-consent conversation with the patient. Dr. Thistlethwaite was unaware that Dr. Harland recorded in the progress notes that he had the high-risk donor conversation with his patients. There was no requirement that the conversation be noted in the medical record, and Dr. Thistlethwaite did not believe that having the conversation at the last minute with the patient would be helpful in obtaining an informed consent.

¶ 26    According to Dr. Thistlethwaite, there was no universal standard of care applicable to the informed-consent procedure. The doctor believed that Dr. Harland's practice and his own practice with regard to obtaining informed consents in transplant surgery were both within the accepted standard of care.

### 3. *Kathy Davis, R.N.*

At the time of the trial, nurse Davis was employed by the UCMC as the living donor nurse coordinator. She met the plaintiff in 2000, when nurse Davis was part of the diseased kidney donor transplant department.

In 2007, the UCMC had procedures governing informed consent where the organ donor was high risk. As the nurse coordinator, when there was an available kidney, nurse Davis would inform the patient that the donor was high risk. Ultimately, it would be the responsibility of the doctors to go over the risks and benefits of a high-risk donor; then the nurse would review the information with the patient. In January 2007, the doctors did not delegate the responsibility of obtaining the informed consent from the patient. The nurse coordinator would provide the factual information to the patient and then inform the doctor, who would explain the risks involved to the patient. A summary sheet was used to record whether a patient had accepted or declined a kidney. The summary sheet recording a refusal was not necessarily kept. While the sheets were accessible to the transplant team, there was no requirement to keep them and, if kept, there was no definite timeframe for their disposal. The summary sheet was neither an official record nor was it part of the patient's medical record.

According to nurse Davis, once she was advised of an available kidney, she would contact the transplant doctor. If the doctor determined it was a suitable candidate, it was her job to contact the patient and provide the information as to the age and lifestyle of the donor. All transplant doctors delegated that job to the nurse coordinators.

### 4. *Katrina Harmon, R.N.*

Nurse Harmon began working at the UCMC in 2003. From 1999 to 2003, she had worked for Gift of Hope as an organ recovery coordinator. At Gift of Hope nurse Harmon was responsible for responding to potential organ donor cases from referring hospitals. Her duties included reviewing charts and obtaining consents for organ donations from families. Once the consents were obtained, she coordinated the recovery of livers, hearts and lungs for transplantation. From 2003 to the present, she had been a pre-kidney and pancreas transplant coordinator at the UCMC.

Nurse Harmon's first meeting with the plaintiff took place on January 10, 2007, the day after the transplant surgery. She could not remember having a face-to-face, one-on-one discussion with the plaintiff prior to that date.

On January 8, 2007, a kidney placer from Gift of Hope informed nurse Harmon that a kidney was available for transplant. Although she could not recall the specifics of the conversation, in accordance with her usual procedure, she would have received the donor's chart and a list of potential recipients. Before speaking to the doctor on call, nurse Harmon would review the donor's chart, which included the donor's social history and clinical information. She would also review the potential recipient's summary sheet containing the potential recipient's medical and insurance information. The summary sheet did not contain a history of prior refusal of organs. That information was not available to the nurses or doctors at the UCMC at the time of a kidney offer; the patient would have to be asked for that information. Nurse Harmon did not ask the plaintiff if she had refused a prior kidney offer, and the plaintiff did not volunteer that information.

¶ 35 On January 8, 2007, after reviewing the donor's chart, nurse Harmon noted that the donor was a homosexual and that he had recently lost eight pounds. Nurse Harmon then contacted Dr. Thistlethwaite. Although she did not recall the specific conversation, nurse Harmon would have provided him with the medical and social history of the donor. Dr. Thistlethwaite was interested in the kidney, and nurse Harmon informed the Gift of Hope to begin compatibility tests. According to nurse Harmon, the transplant procedure should be done as soon as possible.

¶ 36 On January 8, 2007, nurse Harmon called the plaintiff at 5:14 p.m. She remembered speaking with the plaintiff but did not have a specific recollection of the conversation. Because she provided the same type of information to each patient, nurse Harmon would have provided the plaintiff with the following information: the specifics of the donor's death; the results of any infectious disease testing, in this case, the donor tested negative for HIV and hepatitis B and C; the donor was a homosexual and therefore classified as a high-risk donor; and she had reviewed the case with Dr. Thistlethwaite. Upon receiving the information, the potential recipient would state whether he or she was interested or not interested in proceeding with the transplant. Nurse Harmon did remember that the plaintiff wished to discuss the offer with her family and call the nurse back. The fact that the plaintiff wanted time to think about the offer and discuss it with her family was unusual. While her cell phone showed three more calls from the plaintiff, nurse Harmon did not recall what was said during those calls. The UCMC did not require documentation of telephone calls. The plaintiff arrived at the UCMC at 11 p.m.

¶ 37 According to nurse Harmon, in 2007, securing the informed consent from the patient was the responsibility of the transplant surgeon, whether or not the donor was high risk. It was nurse Harmon's responsibility to provide the CDC high-risk information to the potential recipient. The plaintiff's summary sheet indicated that she would accept an expanded criteria donor, *i.e.*, a less than standard kidney. There was nothing on the plaintiff's summary sheet as to whether she would or would not accept a high-risk donor or that she had previously refused a high-risk donor. It was nurse Harmon's custom and practice to inform a potential recipient that the donor was a homosexual. It was also Dr. Thistlethwaite's practice to have her inform the patient that the donor was a homosexual.

¶ 38 *5. Raymond Pollak, M.D.*

¶ 39 Dr. Pollak testified as an expert witness for the plaintiff on informed consent in transplant cases. His medical training and experience were concentrated in the area of transplants. The doctor served as chief of the transplant service at both the University of Illinois at Chicago and the University of Illinois at Peoria. He had performed over 800 kidney transplants; the last one was in 2001. Dr. Pollak was affiliated with the Gift of Hope, serving on its governing board as well as its medical advisory committee, which set the medical policy for the organ bank. He also served on the medical and professional standards board of directors of the UNOS.

¶ 40 Contrary to nurse Harmon's testimony, Dr. Pollak maintained that the Gift of Hope would not have proceeded with the testing unless the plaintiff had accepted the kidney. Without a definite acceptance, the Gift of Hope was free to offer the kidney elsewhere.

¶ 41 Dr. Pollak was given a hypothetical in which he was to assume the following facts: both Dr. Thistlethwaite and nurse Harmon were aware that the donor was high risk, but neither of them supplied that information to the plaintiff; nurse Harmon did not supply the high-risk status of the donor to the plaintiff, and Dr. Thistlethwaite was unaware that the plaintiff lacked this information prior to the transplant surgery; and Dr. Thistlethwaite was unaware that the

plaintiff had twice rejected kidneys from high-risk donors. In response to the hypothetical, Dr. Pollak opined as follows:

> "[A] reasonable physician communicating effectively with his patient should have provided that informed consent based on his own standard of care, the standard of practice that was available through the guidelines as issued by the CDC and the guidelines within The University of Chicago's health system, which required an informed consent process from the treating surgeon."

¶ 42    According to Dr. Pollak, under the local and national standard adopted by the transplant surgeons in Illinois and nationwide, an offer of a high-risk CDC donor kidney required specific verbal or written informed consent. Dr. Pollak maintained that the CDC guidelines governed the standard of care in transplant cases. The doctor acknowledged that there was no federal law placing the CDC in charge of transplants. The OPTN required OPOs, such as the Gift of Hope, to communicate the donor history to the institutions receiving organs. While Dr. Pollak believed it was implicit in the requirement that the doctor provide that information to the patient, he agreed the decision to do so was made by the doctor, in his or her professional judgment; the OPTN did not require it.

¶ 43    Dr. Pollak had no criticism of Dr. Thistlethwaite's practice of having the nurse inform the patient of the donor's high-risk status. In December 2007, after the plaintiff's transplant surgery, the OPTN required that the patient be informed of the high-risk status of the donor.

¶ 44                            *6. Robert Harland, M.D.*

¶ 45    Dr. Harland's deposition testimony was read into the record. From 2001 to 2009, Dr. Harland was the director of the kidney and pancreas transplant program at the UCMC. He did not recall whether, by 2001, the UCMC had developed any policies or procedures in response to the CDC guidelines. As chief of the transplant section, Dr. Michael Millis would have been responsible for developing those policies and procedures. Dr. Harland's role would have been to facilitate the development or the implementation of procedures for kidney and pancreas transplants.

¶ 46    In 2007, if the donor was high risk because of his social history, Dr. Harland believed that the patient would be given that information, but whether the patient received the information might not have been documented in writing. If it was documented, it would be done by the surgeon or the resident (doctor), either on the informed-consent form, in a progress note or in a dictated note. Only the patient and the surgeon would be informed of the high-risk status of the donor. In 2007, a transplant-specific consent form had not yet been finalized. Dr. Harland would use the general consent form to record that the patient had been informed that the donor was high risk; normally, he documented it on the progress note.

¶ 47    It was Dr. Harland's practice to inform the patient prior to surgery of the possibility of the transmission of a viral disease, even if the donor tested negative. The doctor did not recall whether in 2007 the UCMC had any procedures in place requiring that the high-risk-donor information be given to the patient. It would have been in keeping with the UCMC's practice that nurse Harmon would convey the information to the plaintiff that the donor was homosexual and high risk.

¶ 48    Dr. Harland agreed that prior to obtaining an informed consent, the surgeon must first decide whether the risk of transmission of a viral disease was outweighed by the benefits of the

transplant. Due to other medical conditions, the plaintiff had been on and off the organ list, had end-stage renal disease and was using a catheter for dialysis access. The quality of the donated kidney was good and, provided there was informed consent, Dr. Harland believed that the transplant was the best possible outcome for the plaintiff.

### 7. *Dorry Segev, M.D., Ph.D.*

Dr. Segev was an expert witness for the UCMC on informed consent in transplant cases. As part of his surgery residency at Johns Hopkins (Hopkins), he spent three years at Harvard College doing research in the area of molecular biology. After completing his residency at Hopkins, he did a clinical fellowship in transplant surgery there. Dr. Segev then obtained a master's degree in biostatistics and a Ph.D. in clinical investigation. The doctor was an associate professor in the department of surgery at Hopkins. He was appointed to the epidemiology department in the school of public health at Hopkins where research was conducted to develop and implement national polices and standards and to determine if they worked. Dr. Segev had published over 100 articles, 15 to 20 of them dealing with high-risk organ donors.

Prior to the plaintiff's 2007 kidney transplant, the only occasion of HIV transmission resulting from a transplant occurred in 1986. At that time, doctors did not know what HIV was. By 2007, the standard of care required the use of an enzyme-linked immunosorbent assay (the ELISA) test to determine the existence of antibodies indicating an infection. Because the body required time to develop the antibodies, there was a window of one to three months between the time of exposure to the virus and testing positive for it. While there was a risk to the patient from the infection, the patient had a much higher risk from dying from organ failure. Since 1986, 425,000 transplants had been done. Prior to the plaintiff's case, there was zero risk of infection. In addition, until the late 1990s, hepatitis C was unknown to doctors. In describing the risk to the plaintiff by staying on dialysis versus being infected with HIV from a transplanted kidney from a donor who tested negative, Dr. Segev stated:

> "Her risk from death from staying on dialysis was probably, based on our estimates then, a million times higher than her risk of death–her risk of getting HIV or her risk of death from getting HIV if she had gotten it from the transplant. Probably a million times higher."

Dr. Segev opined that Dr. Thistlethwaite's conduct in obtaining an informed consent from the plaintiff was within the standard of care. The transplant team at the UCMC functioned similarly to the one at Hopkins, where Dr. Segev performed transplants every week. At Hopkins, nurse coordinators were part of the transplant team. Because the work was done as a team, the surgeon relied on other team members to perform necessary functions. Dr. Segev explained that Dr. Thistlethwaite's practice of delegating to a nurse coordinator, such as nurse Harmon, the responsibility to provide the patient with all the details about the donor was within the standard of care. Dr. Segev stated:

> "It was certainly within the standard of care. [Dr. Thistlethwaite is] a sort of leader in our field of ethics and informed consent, and he was ahead of all of us in terms of what he did.
>
> In fact, he thought about it to the extent where he felt that if he told the patient about these risk factors, then the patient would be coerced into thinking, well, if he thinks it's fine, then I think it's fine.

And so he sort of separated the physician who was thinking about this from the patient thinking about it by having the nurse coordinator do that, which is very forward thinking and, you know, was well beyond anything any of us were doing."

¶ 53    Dr. Segev maintained that it was within the standard of care for the surgeon to delegate to the resident the signing of the informed-consent form by the patient. Due to the number of team members and the various activities involved in a transplant procedure, it was not unusual for Dr. Thistlethwaite not to recall talking to the plaintiff. Dr. Thistlethwaite's conduct was still within the standard of care.

¶ 54    Dr. Segev further opined that it was within the standard of care not to tell the patient that the organ donor was a homosexual. In the context of implied consent, no one was discussing HIV; there were other infections, such as West Nile virus, that were of more concern. Dr. Segev explained that in January 2007, where the 37-year-old donor was homosexual, with a negative ELISA test, the standard of care for the informed-consent process required the doctor to inform the patient of the important aspects of the donor so that the patient could make an educated decision as to whether to accept the organ. The areas of most concern were the facts impacting the length of time the kidney would last. In this case, other than the homosexual lifestyle of the donor, it was a perfect kidney. Dr. Segev maintained that it was an amazing opportunity for anyone to receive that kidney because, "most people who die in this country are not 35 and healthy." Dr. Segev further maintained that neither the HIV infection and its treatment nor the hepatitis C infection caused the plaintiff's body to reject the donated kidney.

¶ 55    Dr. Segev acknowledged that the CDC guidelines recommended against such a transplant unless there was a survival benefit to it. However, the doctor explained that CDC did not set policy for transplants, only guidelines and recommendations. Policy was set by the OPTN. Prior to 2007, OPTN did not have a policy requiring surgeons to inform patients that the donor had a homosexual lifestyle and tested negative for HIV; it was left up to the surgeon as to whether the information would be provided. At the time the CDC guidelines were written and then clarified, there were no medications to control HIV. HIV is considered a chronic disease, controlled by medication. The estimated life expectancy of a person with HIV was the same as a person's life expectancy without it. Transplants of livers and kidneys from donors with HIV were done now because HIV was so well controlled.

¶ 56    Dr. Segev acknowledged that a patient who received a kidney from an infected donor would most likely be infected with HIV. He further acknowledged writing that a patient who is at the top of the transplant list and likely to receive a noninfected organ very soon was better off refusing the infected or possibly infected kidney. The doctor noted that the plaintiff was receiving dialysis through a catheter in her neck. Because of the risk of infection, the death rate in such cases was the highest of the three methods of dialysis. The plaintiff's position on the list for a kidney transplant did not determine how soon a kidney match would be made for her.

¶ 57    Dr. Segev opined that it was within the standard of care for the transplant surgeon not to inform a potential recipient of the donor's high-risk lifestyle or require the surgeon to know that the potential recipient had refused prior kidneys. Subsequent to the plaintiff's case, the policies were modified to require that patients be informed that a donor is high risk.

¶ 58                              8. *James Michael Millis, M.D.*

¶ 59          Dr. Millis had been with the UCMC since 1994. He was professor of surgery at the University of Chicago. He served as chief of the transplantation section and director of the transplant center at the UCMC. After graduating from the University of Tennessee medical school, Dr. Millis did his general surgical training and fellowship in transplant surgery at the University of California at Los Angeles. The doctor had authored books and articles on transplants. He served on editorial boards and reviewed publications. He had lectured and given presentations on the subject of transplantation in Europe and Asia.

¶ 60          In January 2007, the national and local standards of care with regard to advising patients of the CDC high-risk status of a prospective donor were the same. The standard did not require that the patient be informed of the CDC high-risk status of a particular donor or that the high-risk status be documented. Dr. Millis explained that the risk was so small that it was not an important piece of information for the patient. The UCMC did not have any procedure or policy requirement that the CDC high-risk information be conveyed to the patient or documented in the patient's chart. If a surgeon wished to discuss that information with the patient, the surgeon made that decision; the standard of care did not require it. There was no requirement to document a refusal of a donated organ because the choice to turn down a donated organ could be influenced by events in the patient's life. A patient may turn down an organ from a high-risk donor one time and accept it another time.

¶ 61                              B. Jury Instructions

¶ 62          Over the objection of the plaintiff, the trial court gave the UCMC's jury instruction No. 14, a modified version of Illinois Pattern Jury Instructions, Civil, No. 50.01 (2011) (hereinafter, IPI Civil (2011)), under which the jury could find the UCMC liable if it found Dr. Thistlethwaite liable for the plaintiff's injuries. The jury also received the plaintiff's jury instruction No. 10 (IPI Civil (2011) No. 50.02), identifying both Dr. Thistlethwaite and nurse Harmon as agents of the UCMC and providing that the acts or omissions of its agents were the acts or omissions of the UCMC.

¶ 63                              C. Jury Verdict

¶ 64          The jury returned a verdict finding for the UCMC and against the plaintiff. In answer to the UCMC's two special interrogatories, the jury found that the negligence of the UCMC's agent, Dr. Thistlethwaite, was not a proximate cause of the injuries claimed by the plaintiff, and Dr. Thistlethwaite was not negligent in the manner in which he provided informed consent to the plaintiff.

¶ 65                              D. Posttrial Proceedings

¶ 66          The plaintiff filed a motion for a new trial alleging, *inter alia*, a claim of error in the instructions given to the jury. In addressing the claim of error, the trial court acknowledged that, standing alone, the UCMC's modified instruction was not an accurate statement of the law, in light of the facts of this case. However, the court reasoned that, when considered together, the remaining instructions allowed the jury to consider whether the UCMC was responsible to the plaintiff for the conduct of its agents, Dr. Thistlethwaite and/or nurse Harmon. The court further found that giving both the UCMC's No. 14, the modified IPI Civil

(2011) No. 50.01 and the plaintiff's No. 10, IPI Civil (2011) No. 50.02, remedied the plaintiff's concern that the jury might believe that the plaintiff should have been but was not told about the donor by someone other than Dr. Thistlethwaite.

¶ 67    After finding that none of the other grounds alleged in the motion required that the plaintiff receive a new trial, the trial court denied the motion.

¶ 68    This appeal followed.

¶ 69                                    ANALYSIS

¶ 70    The plaintiff contends that the trial court erred when it gave the UCMC's instruction No. 14, a modified version of IPI Civil (2011) No. 50.01, to the jury. She argues that the error denied her a fair trial.

¶ 71                           I. Standard of Review

¶ 72    "The decision to give or deny an instruction is within the trial court's discretion. The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). Whether an instruction accurately conveys the applicable law is reviewed *de novo*. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008).

¶ 73                              II. Discussion

¶ 74    Unmodified, IPI Civil (2011) No. 50.01 states as follows:

>        "The *defendants are sued as principal and agent*. The defendant _____ is the principal and the defendant _____ is [his] [its] agent. If you find that the defendant [agent] is liable, then you must find that the defendant [principal] is also liable. However, if you find that [the agent] is not liable, then you must find that [the principal] is not liable." (Emphasis added.)

¶ 75    The jury received the UCMC's instruction No. 14, a modified version of IPI Civil (2011) No. 50.01. The modified version stated as follows:

>        "The defendant University of Chicago Medical Center is the principal and Dr. Thistlethwaite is its agent. If you find that Dr. Thistlethwaite is liable, then you must find that the defendant University of Chicago Medical Center is liable. However, if you find that Dr. Thistlethwaite is not liable, then you must find that University of Chicago Medical Center is not liable."

¶ 76    The jury also received the plaintiff's instruction No. 10 (IPI Civil (2011) No. 50.02). The plaintiff's instruction stated:

>        "J. Richard Thistlethwaite, M.D. and Katrina Harmon were agents of the defendant University of Chicago Medical Center at and before the time of this occurrence. Therefore, any act or omission of the agent at that time was in law the act or omission of the defendant University of Chicago Medical Center."

¶ 77    "The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence and, as a result, jury instructions must state the law fairly and distinctly and must not mislead the jury or prejudice a party." (Emphasis omitted.) *Dillon*, 199 Ill. 2d at 507. The parties are entitled to have the jury instructed on the issues presented,

- 12 -

the principles of law to be applied and the necessary facts to be proved to support the jury's verdict. *Dillon*, 199 Ill. 2d at 505.

¶ 78    The plaintiff maintains that it was error to give the UCMC's modified instruction. She asserts that the instruction was not an accurate statement of the law applicable in this case and, in any event, should not have been given where the jury also received IPI Civil (2011) No. 50.02.

¶ 79    We agree that in the context of the facts of this case, the UCMC's instruction No. 14 was not an accurate statement of the law. IPI Civil (2011) No. 50.01 is applicable to a case in which both the principal and the agent are sued, and agency is not at issue. The plaintiff's instruction No. 10 (IPI Civil (2011) No. 50.02) is applicable where only the principal is sued, and there is no issue as to agency. While agency was not contested in this case, nurse Harmon was never a defendant in this lawsuit, and Dr. Thistlethwaite was no longer a defendant at the time of trial. Therefore, the plaintiff's instruction No. 10 was the proper instruction for the jury to receive in this case.

¶ 80    Where IPI instructions accurately state the law applicable in a case and adequately charge the jury, they should be used exclusively. *Colls v. City of Chicago*, 212 Ill. App. 3d 904, 930 (1991). Modified or unmodified, the UCMC's instruction No. 14 was not a correct statement of the law applicable in this case. Therefore, it was error to give the UCMC's instruction No. 14 to the jury.

¶ 81    While acknowledging that the UCMC's instruction No. 14 did not state the applicable law, the trial court denied the plaintiff a new trial on that ground. The court reasoned that the remaining jury instructions allowed the jury to find the actions of either Dr. Thistlethwaite or nurse Harmon or both responsible for the plaintiff's injury. Since the doctor and the nurse were agents of the UCMC, the court concluded that the jury could find the UCMC responsible for their actions which led to the plaintiff's injury.

¶ 82    The plaintiff maintains that the remaining instruction could not cure the error in giving the jury the UCMC's instruction No. 14. The plaintiff's theory of the UCMC's responsibility for her injury was based on the doctrine of *respondeat superior*. At trial, Dr. Thistlethwaite testified that he was responsible for obtaining the informed consent from the patient. Nurse Harmon testified that, as the nurse coordinator, it was her responsibility to inform the potential recipient of a donor kidney that the donor was high risk.

¶ 83    A party is entitled to have the jury instructed on his or her theory of the case, and the failure to do so may require a new trial. *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396, 405 (1992). In support of her theory of liability, the plaintiff tendered her instruction No. 10, which identified both Dr. Thistlethwaite and nurse Harmon as agents of the UCMC and for whose conduct the UCMC was responsible. However, the UCMC's instruction No. 14 permitted the jury to find the UCMC responsible only if Dr. Thistlethwaite was responsible.

¶ 84    In *People v. Jenkins*, 69 Ill. 2d 61 (1977), the supreme court ordered a new trial for the defendant where two of the instructions given to the jury contradicted each other on the essential elements of the offence. *Jenkins*, 69 Ill. 2d at 65. The court held that contradictory instructions on an essential element could not be cured by another instruction that was correct because the jury would be forced to determine which instruction was correct. *Jenkins*, 69 Ill. 2d at 66.

¶ 85 The plaintiff argues that the modified instruction did not allow the jury to hold the UCMC responsible for the conduct of nurse Harmon. We agree. Under the facts of this case, the plaintiff's instruction No. 10, instructed the jury that UCMC was responsible for nurse Harmon's acts as well as those of Dr. Thistlethwaite. The UCMC's instruction No. 14 misled the jury into believing that it could consider only the acts of Dr. Thistlethwaite in determining if the UCMC could be held responsible for the plaintiff's injury. Like *Jenkins*, the fact that the jury received the plaintiff's instruction No. 10, which was an accurate statement of the law applicable in this case, did not cure the error of giving the jury an inaccurate statement of the law. Like *Jenkins*, the jury in this case was required to choose between an accurate instruction which applied to the facts of this case and an inaccurate instruction which did not, the error was not cured and requires that the plaintiff receive a new trial.

¶ 86 The court in *Jenkins* acknowledged that while the other instructions might cure the error caused by an inaccurate instruction, other instructions cannot cure the error where the instructions are in direct conflict. *Jenkins*, 69 Ill. 2d at 66. Contrary to the trial court's finding, the remaining jury instructions did not cure the error caused by giving the jury the UCMC's No. 14 instruction. The sole reference to nurse Harmon in the instructions was the plaintiff's instruction No. 10. The other instructions given to the jury on professional negligence, the issues, and the burden of proof all referred to "a reasonably careful transplant surgeon." If the jury followed all of the instructions, it could not find the UCMC liable for the acts or omissions of nurse Harmon.

¶ 87 A faulty jury instruction does not require reversal unless the error results in serious prejudice to the party's right to a fair trial. *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 164. In determining whether a party has been prejudiced, we consider whether the instructions, taken as a whole, were sufficiently clear so as not to mislead the jury. *Ellig*, 237 Ill. App. 3d at 408. Even if the plaintiff was prejudiced by the use of the UCMC's instruction No. 14, there must be a reasonable basis supporting the conclusion that, but for the error, the verdict might have been different. *Lambie v. Schneider*, 305 Ill. App. 3d 421, 429-30 (1999).

¶ 88 The trial court erred in giving the jury the UCMC's instruction No. 14. The instruction was an inaccurate statement of the applicable law and the error in giving it to the jury was not remedied by giving the jury the plaintiff's instruction No. 10. Giving the UCMC's instruction No. 14 when the jury was also given the plaintiff's instruction No. 10 served to mislead the jury. The error was not remedied by the remaining instructions because they did not allow the jury to consider the actions of nurse Harmon in determining the responsibility of the UCMC for the plaintiff's injury. The error resulted in serious prejudice to the plaintiff in that it denied her the right to have the jury instructed on her theory of the case. In the absence of the UCMC's instruction No. 14, the jury could have found the UCMC responsible for the plaintiff's injury based on the actions of either or both Dr. Thistlethwaite and nurse Harmon.

¶ 89 The error in this case caused serious prejudice to the plaintiff and, but for the error, the jury might have reached a different verdict. Therefore, the plaintiff is entitled to a new trial. Deciding this case as we do, we need not address the remaining issues raised by the plaintiff.

¶ 90 CONCLUSION

¶ 91 The judgment of the trial court is reversed, and the cause is remanded for a new trial.

- 14 -

¶ 92    Reversed and remanded.

¶ 93    JUSTICE LAMPKIN, specially concurring.

¶ 94    I join the panel's opinion, but write separately to note additional reasons that support the conclusion to vacate the judgment in favor of UCMC and against plaintiff and remand the matter for a new trial.

¶ 95    "The decision to give or deny a jury instruction is within the discretion of the circuit court, and a new trial should be granted only if a party's right to a fair trial has been prejudiced seriously." *McCarthy v. Kunicki*, 355 Ill. App. 3d 957, 970 (2005). The court has a duty to give the jury proper guidance and not generate confusion, and contradictory instructions prevent the jury from following the instructions of the trial judge. *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977). The trial court's decision to give the jury both UCMC's instruction No. 14 (a modified version of IPI Civil (2011) No. 50.01) and plaintiff's instruction No. 10 (IPI Civil (2011) No. 50.02), was reversible error. Each instruction was self-contained and differed from the other so as to be inconsistent and contradictory if used together. "Where the instructions are contradictory the jury is put in the position of having to select the proper instruction"–a function that belongs exclusively to the trial court. *Jenkins*, 69 Ill. 2d at 67.

¶ 96    "It is well established that the giving of contradictory instructions on an essential element in the case is prejudicial error, and is not cured by the fact that another instruction is correct." *Id*. at 66. "Generally, if a verdict is tainted by an erroneous instruction then the entire verdict is called into question, unless the instruction pertains to the issue of damages." *Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 42.

¶ 97    Here, "[a] retrial is required because the jury was inadequately instructed and was, therefore, unable to apply the correct legal principles to the submitted evidence." *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 568 (2008). UCMC's instruction No. 14 was inapplicable on its face, did not accurately state the law in the context of this case, was misleading and confusing for the jury, and deprived plaintiff of the strategy she was pursuing of trying the case against the principal only.

¶ 98    Plaintiff voluntarily dismissed Dr. Thistlethwaite before the jury was picked because she sought to eliminate from the jury's realm of concern and speculation any consideration of the consequences of a verdict against him. Accordingly, the jury never knew that Dr. Thistlethwaite was ever a defendant, and there was no verdict form whereby the jury could have found him liable. However, the erroneous instruction No. 14, tendered by UCMC and given by the trial court over plaintiff's objection, gave plaintiff the impossible burden of establishing, and the jury the impossible task of determining, that the nonparty agent, Dr. Thistlethwaite, was liable. Because jurors are instructed that they may not discharge their duty by picking out some instructions and disregarding others, this court cannot assume that the jurors ignored instruction No. 14.

¶ 99    There was sufficient evidence in this case to support the verdict in favor of UCMC. The jury could have found nurse Harmon's testimony–that it was her standard practice to inform transplant patients about an organ donor's high-risk status–more credible than plaintiff's testimony that she did not receive any donor-lifestyle information from nurse Harmon. The jury also heard testimony concerning the standard of care applicable to the informed-consent procedure. Properly guided by plaintiff's instruction No. 10, the jury could have consulted the remaining instructions to determine whether the act of an agent, being an act of UCMC, gave

- 15 -

rise to a verdict for either party. That process, however, was derailed by UCMC's instruction No. 14, which mandated a verdict for UCMC unless the jury could perform the impossible task of finding Dr. Thistlethwaite liable. Moreover, the instruction removed from any meaningful consideration a key and hotly contested factual dispute in the case–the actions of nurse Harmon. As far as can be known, the judgment rendered against plaintiff might well have been made on the erroneous basis that the standard for informed consent required that plaintiff be informed of the donor's high-risk status but Dr. Thistlethwaite was not liable where he delegated that task to nurse Harmon and she failed to fulfill that task.

¶ 100    The erroneous instruction No. 14–which required the jury to find UCMC not liable if it found Dr. Thistlethwaite not liable–seriously prejudiced plaintiff. The instruction did not define "liable," give the jury any guidance on how it was to decide whether Dr. Thistlethwaite (a nonparty) was either liable or not liable, or account for the vital role of nurse Harmon in the outcome of this case. The jury was forced to figure out the meaning of a critical undefined legal term and was directed by the court to ground its ruling upon the meaning of an undefined term. Therefore, the erroneous jury instruction constituted reversible error.