# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *Parsons v. Norfolk Southern Ry. Co.*, 2017 IL App (1st) 161384

</div>

| | |
|---|---|
| Appellate Court Caption | MICHAEL PARSONS, Plaintiff-Appellee, v. NORFOLK SOUTHERN RAILWAY COMPANY, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-1384 |
| Filed<br>Rehearing denied | August 25, 2017<br>September 27, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-9265; the Hon. Donald J. Suriano, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Hall, Prangle & Schoonveld, LLC (Hugh C. Griffin, of counsel), Donohue, Brown, Mathewson & Smyth, LLC (Karen Kies DeGrand, of counsel), and Daley, Mohan, Groble, P.C. (Raymond H. Groble III and Jeffrey J. Scolaro, of counsel), all of Chicago, for appellant.<br><br>Law Office of Michael W. Rathsack, of Chicago (John M. Power, George T. Brugess, and Michael W. Rathsack, of counsel), for appellee. |

| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Rochford and Delort concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff-appellee Michael Parsons was employed by defendant-appellant Norfolk Southern Railway Company as a railroad conductor since September 2010. Plaintiff was injured at defendant's railyard on September 2, 2011, when his left foot was crushed between the railcar he was riding and a car that he had recently left on an adjacent track. Plaintiff sued defendant for negligence under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq* (2006)). The following facts are derived from the subsequent jury trial in November 2015.

¶ 2    Defendant operates the 51st/55th Street railyard in Chicago (railyard), where empty intermodal railcars are loaded with shipping containers. Plaintiff's injury occurred at the southern end of the railyard, where several numbered tracks run north from a main "runner track" at the south end of the railyard. Several "switch tracks," with apparatus allowing cars to be routed from one track to another, diverge from the runner.

¶ 3    A number of adjacent tracks run north from the runner track. Depending on the distance between adjacent tracks, there may not be sufficient room for cars traveling on one track to safely pass cars on an adjacent track. The point on each track at which there is sufficient distance for cars to safely pass cars or equipment left on an adjacent track is known as the "clearance point." Defendant's internal documents define a clearance point as "the location on a track that does not obstruct the movement of equipment, including, where permitted, a person riding the side of a car, on adjacent tracks." Tracks 24 and 25 are adjacent tracks stemming north from the runner track. Prior to 2010, the distance between tracks 24 and 25 was at least 12 feet.[1] In 2010, defendant performed work at the railyard, including the replacement of switches and related equipment known as "turnouts." As a result of that work, the distance between tracks 24 and 25 was narrowed, so that at one point the tracks were as close as 10 feet 6 inches apart.

¶ 4    Defendant issued a bulletin to employees, effective January 1, 2011, in which "Item 41" stated that:

> "All the switches at the south end of 51st [S]treet Yard in Chicago have been replaced. Some of the track configurations and clearance points have been changed. Please take time to note the new track alignments and the new clearance points. All clearance points should be 225 feet (4½ car lengths) from the switch point."

Plaintiff acknowledged at trial that he had read the bulletin. However, he claimed he lacked notice that the distance between tracks 24 and 25 had been reduced to as little as 10 feet 6 inches.

---

[1]Certain witnesses testified that the distance was formerly 12 feet 6 inches.

¶ 5 On September 2, 2011, plaintiff and a locomotive engineer, David Compton, were attempting to separate a single car needing repairs from a chain of several railcars. Compton remained in the locomotive and took radio commands from plaintiff.

¶ 6 Plaintiff sought to isolate the car needing repair and to leave it on track 24. From the runner track at the south end of the railyard, plaintiff and Compton moved the chain of cars in reverse, traveling north past the switch point for track 25. Such reverse movements are referred to as "shove" moves.

¶ 7 Plaintiff and Compton separated the last 8 cars of the chain and left them on track 25 between the switch point and the clearance point (that is, south of the clearance point). The portion of a track between the switch and the clearance point is referred to as being "in the lead." Plaintiff and Compton moved the remaining cars south back to the runner track, then "shoved" those remaining cars north on track 24. As the cars moved along track 24, plaintiff rode on the east side of the northernmost car while he directed Compton by radio.

¶ 8 As the cars on track 24 approached the cars that had been left on adjacent track 25, plaintiff's left foot was caught between the car he was standing on and a car on track 25. The distance between the two tracks at that point was 10 feet 6 inches. Plaintiff testified that he could have passed safely if the tracks were farther apart, as they were before the 2010 work.

¶ 9 Plaintiff acknowledged that it was his decision to leave the cars on track 25 "in the lead," south of the clearance point. He also acknowledged that the clearance points on tracks 24 and 25 were marked with bright orange paint. However, plaintiff maintained that it was custom and practice at the railyard to temporarily leave cars south of the clearance point. He agreed that, "when switching moves are done" or if he "was leaving for the day," it would not be permissible to leave a car between the switch and clearance point. However, he testified that during switching moves, it was "standard operating procedure" to temporarily leave a car in the lead.

¶ 10 Plaintiff also testified that it was common practice for conductors to ride on the side of cars between switches and clearance points. Plaintiff acknowledged he was aware of a separate bulletin issued by defendant which stated that "Employees are prohibited from riding the sides of cars" in certain locations, including the "Body of yard, Scale track through Track 34, due to insufficient track centers." Plaintiff also acknowledged that, in February 2011, he took a test administered by the defendant, in which he correctly answered "no" to the question: "Are employees allowed to ride the sides of equipment within the body of the yard ***?" Plaintiff admitted that it was a company rule that "there is no riding in the body of the yard." However, he testified that it was never explained to him what "body of the yard" meant and claimed that he did not violate the company rule.

¶ 11 Plaintiff also explained that, under the "radio rule," an engineer must stop the train once it reaches half the distance ordered by the conductor's last command if the engineer has not received a subsequent radio command. Plaintiff testified that, just before his injury, he had directed Compton to "shove" five car lengths, and so Compton should have stopped after 2 ½ car lengths. Plaintiff testified that Compton did not do so, violating the radio rule.

¶ 12 Plaintiff called three fact witnesses who worked as conductors at the railyard: Don Myers, Randy Fitzgerald, and David Orona. Consistent with plaintiff's testimony, those witnesses agreed that it was custom and practice to leave cars temporarily on the portion of a track between the switch and the clearance point, as plaintiff had done on track 25. Those witnesses also agreed that it was customary for conductors to ride cars in that area. They also testified

that the term "body of the yard" refers to the portion of track north of the clearance points, but does not include the area between switches and clearance points.

¶ 13 Plaintiff's expert witnesses included Alan Blackwell, who opined that the distance between tracks 24 and 25 violated Illinois Commerce Commission (ICC) regulations, specifically section 1500.140 of the Administrative Code (Code), which requires tracks constructed or reconstructed after 1920 to have at least 13½ feet between adjacent tracks. 92 Ill. Adm. Code 1500.140, amended at 29 Ill. Reg. 20360 (eff. Dec. 15, 2005). Although Blackwell acknowledged that the railyard was built before 1920, he opined that section 1500.140 of the Code applied because the 2010 work at the railyard constituted "reconstruction." Blackwell opined that prior to 2010, there had been sufficient clearance between tracks 24 and 25, but that the reconstruction work caused a dangerous "pinch point."

¶ 14 Plaintiff also called Colon Fulk as an expert on railroad operating practices. Fulk testified that Compton had violated the "radio rule" codified in Title 49, Part 220 of the Code of Federal Regulations.[2] Fulk also opined that it was acceptable for plaintiff to leave cars on track 25 south of the clearance point.

¶ 15 Dr. Grevious, plaintiff's reconstructive surgeon, testified that plaintiff's heel bone was "broken completely off" and the "bottom of the foot was basically peeled off of the foot." Dr. Grevious described numerous surgeries, including a surgery transplanting flesh from plaintiff's thigh to reconstruct the heel. Dr. Grevious explained that, in 2013 and 2014, there were several occasions where the wound reopened, requiring plaintiff to avoid bearing weight on his left foot. Dr. Grevious agreed that plaintiff would be at risk for infection and amputation for the rest of his life.

¶ 16 Plaintiff also called Dr. Dennis Gates, an orthopedic surgeon, who offered expert testimony based on his review of plaintiff's medical records and examinations of plaintiff. He opined that plaintiff suffered from a chronic infection, which caused recurring episodes where the wound reopened. Dr. Gates stated that plaintiff would have "ambulation problems for the rest of his life" and a number of other chronic conditions as a result of the injury.

¶ 17 Margo DiVenere, a nurse case manager, testified that she helped coordinate plaintiff's care since the injury. She described a number of instances where the wound reopened and became infected, during which times plaintiff could not bear weight on his left foot. She agreed that, for the majority of time since the injury, his wound was not fully closed.

¶ 18 Plaintiff described his injury and treatment in detail, noting he had at least 12 surgeries. He explained that he had been through several "cycles" in which the wound reopened. Plaintiff testified that, as a result of the injury, he was limited to sedentary work and could not resume work as a conductor. In late 2014, he returned to work for defendant as a dispatcher.

¶ 19 After plaintiff rested, defendant moved for a directed verdict, which the trial court denied.

¶ 20 In its case in chief, defendant called Christopher Fezler, defendant's conductor training coordinator. Fezler denied that it was permissible for conductors to ride on railcars south of clearance points. He also denied that defendant's company rules permitted conductors to temporarily leave cars "in the foul" of adjacent tracks, as plaintiff had done. Fezler testified

---

[2]The regulation states: "When radio communication is used in connection with the shoving *** of a train, locomotive, car, or on-track equipment, the employee directing the movement shall specify the distance of the movement, and the movement shall stop in one-half the remaining distance unless additional instructions are received." 49 C.F.R. § 220.49 (1998).

that conductors may ride equipment "anywhere but the body of the yard," but he was not aware of any rule defining the term "body of the yard."

¶ 21 Lloyd Brewer, who had worked for defendant as an assistant division engineer, acknowledged that the 2010 work at the railyard decreased the distance between tracks 24 and 25, but he testified that this was acceptable because that area was a "no parking zone" and "not the body of that track." Brewer testified that the term "body of the track is from the lead or the clearance points on each end of the yard to within the parallel tracks through the yard." He was not familiar with the term "body of the yard."

¶ 22 Bernard Morris, a former ICC railroad safety administrator, testified for defendant as an expert witness. Morris opined that the work performed in 2010 was not reconstruction, and thus did not require defendant to bring the yard into compliance with ICC regulations. Morris further opined that ICC track regulations do not apply to the portion of tracks between switches and clearance points, including the site of plaintiff's injury. Morris testified that railroad ties are painted bright orange to mark clearance points.

¶ 23 Roy Dean, a civil engineer, also testified as an expert witness for defendant. He stated that there are "no regulations at all that deal with any type of clearance between the switch point and the clearance point." Dean testified that adjacent tracks are typically much closer together between switches and clearance points than on "open track." He opined that it was "acceptable" that the work in 2010 narrowed the distance between tracks 24 and 25 "because you're still within that area between the clearance point and the switch point."

¶ 24 Defendant also elicited expert testimony from Foster Peterson, director of safety for the Tennessee Valley Railroad, who opined that it is never acceptable to leave cars between switches and clearance points. Defendant's final witness was Jerome Rhymes, a conductor employed by defendant, who described defendant's conductor training program.

¶ 25 After defendant rested, the parties' counsel and the trial court conferred regarding the content of jury instructions, verdict forms, and special interrogatories. During the conference, the trial court overruled defendant's objections to a jury instruction referring to section 1500.140 of the Code, as well as an instruction regarding plaintiff's assumption of risk. Thus, following counsel's closing arguments, the trial court's instructions to the jury included instruction 19, which stated:

"There was in force in the State of Illinois at the time of the occurrence in question a certain administrative regulation which prescribed minimum track centers of 13'6" for subsidiary freight tracks that were newly constructed or reconstructed after 1920.

Tracks 24 and 25 at the [railyard] are subsidiary freight tracks.

If you decide that [defendant] violated the regulation on the occasion in question, then you may consider the fact together with all the other facts to what extent, if any, [defendant] was negligent before and at the time of the occurrence."

Separately, jury instruction 27 provided that a railroad employee "shall not be held to have assumed the risks of his employment in any case where the injury resulted in whole or in part from the negligence of any of the officers, agents or employees of the railroad, or by reason of any defect, due to the railroad's negligence."

¶ 26 The jury also received a "special interrogatory #1" that included four questions:

"1. Do the [ICC] track center regulations apply to the portion of the [railyard] involved in the incident between the clearance points and switches?

Yes _____ No_____

If you answered yes, go to Question #2. If you answered no, you are finished with this interrogatory.

2. Was 'new construction' or 'reconstruction' work performed on the south end of Track 24 between the clearance point and the switch after 1920, but before the date of the accident?

Yes _____ No _____

If you answered yes, go to Question #3. If you answered no, you are finished with this interrogatory.

3. Did [defendant] violate the [ICC] regulation prescribing minimum track centers of 13'6"?

Yes _____ No _____

If you answered yes, go to Question #4. If you answered no, you are finished with this interrogatory.

4. Did the violation cause or contribute to cause, in whole or in part, [plaintiff's] injuries?

Yes _____ No _____ "

Separately, "special interrogatory #2" asked the jury whether defendant had violated the "radio rule," and, if so, whether such a violation contributed to plaintiff's injuries.

¶ 27    On November 19, 2015, the jury returned a verdict for plaintiff in the amount of $22,474,102, itemized to include $1.5 million for lost earnings and $19 million in damages for "[t]he pain and suffering and disability experienced and reasonably certain to be experienced in the future." The jury found that plaintiff was zero percent negligent. The jury answered "Yes" in response to each of the four questions in special interrogatory #1. In special interrogatory #2, the jury found that the "radio rule" had been violated, but that the violation did not contribute to plaintiff's injury.

¶ 28    On November 19, 2015, the trial court entered judgment on the jury's verdict. Defendant filed a posttrial motion, arguing in the alternative, seeking either a judgment in defendant's favor notwithstanding the verdict, a new trial, or remittitur of the jury's verdict.

¶ 29    On April 21, 2016, the trial court denied the relief sought in defendant's posttrial motion, except that it ordered a $1 million remittur from the jury's $1.5 million award for lost earnings. Plaintiff accepted the remittitur on May 4, 2016. On that date, the court entered a corresponding order, reducing the amount of plaintiff's judgment by $1 million, to $21,474,102. Defendant filed a notice of appeal on May 19, 2016.

¶ 30                                    ANALYSIS

¶ 31    In urging that we reverse the judgment and remand for a new trial, defendant argues that (1) the jury's finding that plaintiff was not contributorily negligent was against the manifest weight of the evidence, (2) the jury received an improper instruction concerning assumption of risk, (3) jury instruction 19 and special interrogatory #1 deprived defendant of a fair trial, (4) comments by plaintiff's counsel deprived defendant of a fair trial, and (5) the jury instructions and verdict form improperly permitted the jury to award damages for disability in addition to

pain and suffering. The defendant additionally seeks a new trial or, alternatively, a remittur on the ground that the $19 million award for "pain and suffering and disability" was excessive.

¶ 32   Before discussing the merits of each argument, we note that "[u]nder the [FELA] a carrier is liable in damages for injury resulting in whole or in part from the negligence of any of its officers, agents, or employees. *** In determining whether a verdict in plaintiff's favor is supported on the record, the sole question is whether there is any evidence, considered in the light most favorable to the plaintiff, that defendant was guilty of negligence which contributed in whole or in part to the injury." *Finley v. New York Central R.R. Co.*, 19 Ill. 2d 428, 433 (1960). "The fact that contrary inferences would be equally supported by the evidence is not sufficient to show unreasonableness of the verdict. It is the jury's function to weigh contradictory evidence, judge the credibility of the witnesses and draw the ultimate conclusion as to the facts. Its conclusion[s] *** should not be set aside merely because different conclusions could be drawn ***." *Id.* at 436. "[W]hether a new trial is justified on the grounds that the verdict was against the manifest weight of the evidence is reviewed for an abuse of discretion." *Rodriguez v. Northeast Illinois Regional Commuter R.R. Corp.*, 2012 IL App (1st) 102953, ¶ 48.

¶ 33   Further, as stated by our supreme court, we recognize that "no useful purpose would be served by granting a new trial when the record reveals that the errors did not change the result reached by the jury. *** Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment *** will not be disturbed." (Internal quotation marks omitted.) *J.L. Simmons Co. v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 115 (1985).

¶ 34   With these principles in mind, we first address defendant's claim that the jury's failure to find contributory negligence was against the manifest weight of the evidence. Defendant asserts that plaintiff negligently left cars on track 25 between the clearance point and the switch, such that they were "in the foul" of track 24. Defendant also claims that plaintiff negligently rode the lead car on track 24, violating the company rule against riding cars in "the body of the yard."

¶ 35   Plaintiff responds that his decision to leave cars on track 25 between the switch and clearance point was not negligent but was consistent with "custom and practice." With respect to the rule against riding in the "body of the yard," plaintiff notes that the meaning of the phrase was disputed at trial and that other employees testified that they customarily rode cars south of the clearance point.

¶ 36   "Contributory negligence will not bar a recovery under the FELA (45 U.S.C. sec. 53 (1982)); however, the doctrine of comparative negligence has been retained so that a plaintiff's negligence may diminish the amount of damages recoverable." *Hamrock v. Consolidated R. Corp.*, 151 Ill. App. 3d 55, 61 (1986). "A party is guilty of contributory negligence if he fails to exercise ordinary care for his own safety and if his negligence is the proximate cause of his injury. [Citation.] What constitutes contributory negligence cannot be defined in exact terms, and each case must be determined on its own facts and circumstances. [Citation.] The question of contributory negligence is ordinarily a question of fact for the jury to decide [citations] and the reviewing court will not set aside a jury's verdict on the ground that it is contrary to the manifest weight of the evidence unless it is obvious that the jury arrived at the wrong conclusion [citation]." *Hiller v. Harsh*, 100 Ill. App. 3d 332, 335 (1981). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent, or

when the findings appear to be unreasonable, arbitrary, or not based on evidence." *Leonardi v. Loyola University*, 168 Ill. 2d 83, 106 (1995).

¶ 37     In light of the conflicting trial testimony, we cannot say that the jury's failure to find plaintiff contributorily negligent was against the manifest weight of the evidence. Defendant primarily relies on plaintiff's alleged failure to comply with company safety rules. "Evidence of a violation of a company safety rule raises a question of fact as to contributory negligence." *Uhrhan v. Union Pacific R.R. Co.*, 155 Ill. 2d 537, 547 (1993). However, contributory negligence need not necessarily be found whenever there is evidence that an employee has violated a company rule. "Whether a company rule applies in the current situation" and "issues of plaintiff's reasonableness" are issues of fact for the jury. *Id.* at 547-48. In *Hamrock*, 151 Ill. App. 3d 55, this court held: "*The fact that* [plaintiff's conduct] *may have violated safety rules did not establish negligence as a matter of law* [citation] *or that* [plaintiff's] *actions were the sole cause of his injuries, particularly in light of evidence that the rules were seldom utilized or were nullified by custom.* [Citations.]" (Emphasis added.) *Id.* at 64.

¶ 38     In this case, evidence that plaintiff violated defendant's rules did not require the jury to find contributory negligence. The jury could find that plaintiff's conduct was reasonable, given the evidence that it was customary to leave cars south of the clearance point during switching operations and for conductors to ride cars between switches and clearance points. It is not our role to second-guess the jury's credibility determinations and factual findings. Accordingly, we cannot conclude that it was against the manifest weight of the evidence for the jury to find that plaintiff was not guilty of contributory negligence.

¶ 39     Defendant's second claim of error is that instruction 27, which told the jury that plaintiff "shall not be held to have assumed the risks of his employment," was improper because defendant did not assert an assumption of risk defense at trial. Defendant argues that this instruction confused the jury into believing "that they should ignore Plaintiff's varied significant contributory negligence."

¶ 40     "The trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion. [Citations.] The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. [Citation.] A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant. [Citation.]" *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273-74 (2002). "A faulty jury instruction does not require reversal unless the error results in serious prejudice to the party's right to a fair trial. [Citation.] In determining whether a party has been prejudiced, we consider whether the instructions, taken as a whole, were sufficiently clear so as not to mislead the jury." *Doe v. University of Chicago Medical Center*, 2014 IL App (1st) 121593, ¶ 87.

¶ 41     In *Schultz*, our supreme court discussed the use of an assumption of risk instruction in an FELA case, explaining:

"There is some overlap between the doctrines of assumption of risk and contributory negligence; however, the defenses are not interchangeable. [Citation.] Assumption of risk is 'an employee's voluntary, knowledgeable acceptance of a dangerous condition that is necessary for him to perform his duties,' while contributory negligence is a 'careless act or omission on the plaintiff's part tending to add new dangers to

conditions that the employer negligently created or permitted to exist.' [Citation.]" *Schultz*, 201 Ill. 2d at 282.

¶ 42     As in this case, the *Schultz* defendant urged that it was error to instruct the jury that assumption of risk was not a defense in an FELA case because it could confuse the jury about the potential application of contributory negligence. *Id.* The supreme court acknowledged that use of "an instruction on assumption of risk in a case where the 'defense' has been neither pleaded nor argued has been condemned by several courts as 'a confusing, negative statement which refers to issues not involved in an FELA case.' [Citations.]" *Id.* at 283. However, the supreme court noted that the *Schultz* defendant did not identify any "case in which the giving of an assumption of risk instruction in an FELA case was held to be reversible error." *Id.* The court in *Schultz* reasoned: "Even if the giving of the instruction was erroneous, the jury still found plaintiff 50% at fault. This comports with the evidence and indicates that the jury was not confused by the alleged instruction. [Citation.] Therefore, we conclude that if the assumption of risk instruction was submitted to the jury, it does not rise to the level of reversible error." *Id.* at 283-84.

¶ 43     The *Schultz* decision indicates that, absent some indication that the jury was confused by the assumption of risk instruction, its inclusion is not reversible error. *Id.* at 283. We reach a similar conclusion in this case. Even assuming that instruction 27 should not have been given, we are not persuaded that defendant can show any resulting prejudice. We acknowledge that the jury in *Schultz* found plaintiff 50% at fault, whereas the jury in this case found zero contributory negligence by plaintiff. Nonetheless, we do not presume that this finding stemmed from jury confusion. There is nothing to suggest that instruction 27 caused the jury to believe that it could not consider contributory negligence. To the contrary, the jury's ability to reduce any damages in proportion to plaintiff's contributory negligence was thoroughly argued by the parties and repeatedly explained by the trial court. Defense counsel's closing argument told the jury that, if it found fault by defendant, it would also "have to decide what is [plaintiff's] responsibility for this incident," urging the jury that "your minimum starting point [should be] that [plaintiff] is 90 percent responsible" for his injury. The trial court repeatedly instructed the jury that any recovery by plaintiff must be reduced in proportion to his contributory negligence, and the verdict form also reiterated this point.

¶ 44     In light of the jury instructions in their entirety, we are not persuaded that the assumption of risk instruction misled the jury about its ability to find contributory negligence. Thus, we conclude that the use of instruction 27 is not reversible error.

¶ 45     The defendant's third claim of error is based upon the use of jury instruction 19, concerning the ICC regulation on minimum track clearance, section 1500.140 of the Code. Defendant has a two-part argument. First, defendant asserts that the jury should not have been instructed on the regulation because it applies only to "parallel tracks," but that "the tracks are not parallel between the switches and the clearance point" where plaintiff was injured.[3] Secondly, defendant challenges the specific statement in instruction 19 that "[t]racks 24 and 25 *** are subsidiary freight tracks." Defendant argues that this language essentially "directed a

_____

[3]We note that defendant does not make the argument that the applicability of the ICC regulation was a question of law that should not have been submitted to the jury. See *Schultz*, 201 Ill. 2d at 288 (holding in an FELA case that "[t]he determination of whether OSHA regulations apply to the area of the retaining wall" where plaintiff was injured was a question of law).

finding against the railroad" as it "told the jury that the ICC track center regulations applied to the entirety of Tracks 24 and 25—even the portion between the switches and the clearance points where the tracks were not parallel." As a result, defendant suggests that the jury was compelled to answer "Yes" when special interrogatory #1 asked whether the ICC regulation applied to the site of plaintiff's injury.

¶ 46      In response, plaintiff first asserts that defendant forfeited this claim of error. Although defense counsel stated "we object" when instruction 19 was raised at the jury instruction conference, plaintiff argues that defense counsel did not state specific grounds for the objection to preserve it for review. In response to the forfeiture argument, defendant's reply brief notes that, in addition to its objection at the jury instruction conference, it filed a pretrial motion *in limine* in which it argued that "the [ICC] regulations only apply to parallel tangent tracks." Defendant also notes that its motion for directed verdict argued that ICC regulations did not apply.

¶ 47      "A party forfeits the right to challenge a jury instruction that was given at trial unless it makes a timely and specific objection to the instruction and tenders an alternative, remedial instruction to the trial court. [Citation.] These requirements ensure that the trial court has the opportunity to correct a defective instruction and to prevent the challenging party from gaining an unfair advantage by failing to act when the trial court could remedy the faulty instruction ***. [Citation.]" *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 557 (2008).

¶ 48      Defendant's motion *in limine* and motion for directed verdict demonstrate that, before the jury instruction conference, defendant argued that section 1500.140 of the Code did not apply to the portion of the tracks where plaintiff was injured. We conclude that these motions, combined with the general objection at the jury instruction conference, preserved defendant's argument that instruction 19 was improper because the ICC regulation did not apply. However, we also conclude that defendant forfeited its more specific argument challenging the statement in instruction 19 that "[t]racks 24 and 25 *** are subsidiary freight tracks." At no point did defendant notify the trial court of any specific objection to this portion of the instruction, or propose any alternative language. Thus, that specific argument was forfeited.

¶ 49      We thus review defendant's argument that instruction 19 was improper because section 1500.140 of the Code applies only to parallel tracks, but the tracks were not "parallel" where plaintiff was injured. As support for its position, defendant relies on the testimony of its expert witnesses Morris and Dean, as well as section 1500.20(a) of the Code, which states: "The horizontal clearances prescribed in this Section are for tangent tracks." 92 Ill. Adm. Code 1500.20(a), amended at 29 Ill. Reg. 20360 (eff. Dec. 15, 2005).[4] Although plaintiff's expert witness Blackwell, as well as fact witnesses Fitzgerald and Orona, testified that the tracks were parallel, defendant asserts that such testimony "defie[s] the undisputed physical facts." Defendant urges that diagrams introduced at trial demonstrate that the tracks "are not parallel between the switches and the clearance point," such that the regulation does not apply to the tracks where plaintiff was injured.

¶ 50      "[J]ury instructions must state the law fairly and distinctly and must not mislead the jury or prejudice a party. [Citation.] The parties are entitled to have the jury instructed on the issues presented, the principles of law to be applied and the necessary facts to be proved to support

---

[4]Defendant does not cite any legal authorities defining "parallel" in the context of railroad tracks. Defendant cites a Wikipedia article to assert that "tangent tracks" are "straight tracks. "

the jury's verdict." *Doe*, 2014 IL App (1st) 121593, ¶ 77. "A party is entitled to have the jury instructed on his or her theory of the case." *Id.* ¶ 83.

¶ 51   Defendant does not argue that instruction 19 misstated the substance of the ICC regulation,[5] but argues that the regulation only applies to parallel tracks. Even assuming defendant is correct that section 1500.140 of the Code only applies to parallel tracks (which we need not decide), whether the tracks were parallel at the site of plaintiff's injury was a disputed factual question for the jury. Notwithstanding the diagrams cited by defendant, the jury could credit plaintiff's expert Blackwell, as well as fact witnesses Fitzgerald and Orona, who testified that the tracks were parallel. It is not this court's role to reweigh such conflicting evidence. As plaintiff submitted evidence supporting its theory that the ICC regulation applied to the site of injury (and that defendant's violation of the regulation caused plaintiff's injury), we do not find error in the use of instruction 19.

¶ 52   As a fourth basis for reversal, defendant claims that several categories of remarks by plaintiff's counsel deprived it of a fair trial. First, defendant claims that plaintiff's counsel improperly urged the jury to "send a message" with its verdict, citing counsel's remarks that the jury would decide "very important issues" and that its "verdict is going to have a big impact on safe railroading" in Illinois. Defendant emphasizes that plaintiff's opening argument told the jury "to sign a verdict that says this yard was reconstructed and has to be brought back up to code," and his closing argument urged the jury to "make them bring it up to code."

¶ 53   Defendant also argues that plaintiff improperly accused defendant of relying on "false evidence." In closing argument, plaintiff's counsel suggested that defendant's witnesses were "coached to say" that there was a "no parking zone" between switch points and clearance points, which was "something that the lawyers made up" and a "false rule." Similarly, plaintiff's closing argument cited the derogatory use of the term "railroaded," stating:

> "There's another definition of 'railroad' if you look in the dictionary, and what it says is 'convicted by false evidence' as in 'I've been railroaded.'
>
> Do you know why that definition is in the dictionary, why 'railroad' means to railroad someone? Because of what you see happened here."
>
> [Defense objection overruled]
>
> "So the word 'railroad' means to convict with false evidence, and that definition is in the dictionary because this is what the railroads have been doing since way before 1920. You know, it's trying to call this a no-parking zone when five witnesses *** show you that everyone parks here, this is the way this move is always made."

¶ 54   Defendant additionally claims that plaintiff's closing argument inflamed the jury by suggesting that defendant threatened the public, citing the comment: "This is a railroad car in the middle of a South Side residential neighborhood. There's houses right here, there's a playground here. They put these tracks so close together that the cars will hit right next to

---

[5]Instruction 19 was based on Illinois Pattern Jury Instructions, Civil, No. 60.01 (1st ed. 1989) (hereinafter IPI Civil 1st), regarding "Violation of Statute, Ordinance, or Administrative Regulation." The "Notes on Use" accompanying IPI Civil 1st 60.01 state that it "should be given only where the evidence would support a finding that the injury complained of was proximately caused by a violation of a[n] *** administrative regulation *** intended to protect against such an injury, and that the injured party is within the class intended to be protected by the *** administrative regulation." IPI Civil 1st 60.01, Notes on Use. In this case, Blackwell's expert testimony provided such evidence.

houses." Defendant also cites counsel's comments "Can you imagine if John Q. Public had one of these houses here" and "the law applies to John Q. Public as much as it applies to the railroad."

¶ 55    Defendant otherwise asserts that plaintiff's counsel improperly referred to injuries to other railroad employees when he (1) described defense witness Morris as an expert who testifies "in these close clearance cases that the railroad did nothing wrong," (2) commented during another witness's testimony that a "lot of people get hurt during shove moves, and the railroad knows that," and (3) asked questions of plaintiff's nurse case manager implying that she worked with other injured employees of defendant.

¶ 56    Finally, defendant argues that plaintiff's counsel insinuated that defendant was "motivated by greed," noting that (1) counsel's opening argument stated that defendant would "have less revenue" if it maintained greater distances between tracks, (2) counsel asked an expert witness if the 2010 railyard work would result in "more revenue," and (3) counsel's closing argument stated that "capacity is more important to this railroad than safety."

¶ 57    In closing argument, "[c]ounsel is allowed wide latitude in drawing reasonable inferences from the evidence." *Guski v. Raja*, 409 Ill. App. 3d 686, 698 (2011). "A new trial is not warranted based on an improper opening statement or closing argument unless, when the trial is viewed in its entirety, the argument resulted in substantial prejudice to the losing party or rose to the level of preventing a fair trial. [Citations.] Errors in opening statements or closing argument *must* result in substantial prejudice *such that the result would have been different absent the complained-of remark* before reversal is required. [Citations.]" (Emphases in original.) *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84.

¶ 58    Viewing the trial as a whole, we cannot say that the challenged comments, individually or cumulatively, constituted substantial prejudice. First, to the extent counsel told the jury that the issues in this case were "important," we find such comments too vague to result in any prejudice. With respect to the comments urging defendant to bring the tracks "up to code," we note that the applicability of section 1500.140 of the Code was central to plaintiff's case, was discussed by expert witnesses for both parties, and was also discussed at length in defendant's closing argument. Under these circumstances, we are not persuaded that substantial prejudice resulted from the few cited comments that the tracks must be brought "up to code." We reach a similar conclusion concerning plaintiff's counsel's references to a "false rule" or "false evidence." Viewing the trial as a whole, we do not conclude that these comments would incite substantial prejudice. Rather, they were apparently related to plaintiff's argument that the company rules cited by defendant were inapplicable or customarily were not followed.

¶ 59    We also do not find reversible error with respect to the comments referencing public safety. First, we note that defense counsel did not object to the portion of closing argument stating that the railyard was in a "residential neighborhood." Thus, any objection to that comment was waived. See *Ramirez v. City of Chicago*, 318 Ill. App. 3d 18, 25 (2000). In any event, we do not agree with defendant that these comments "conjur[ed] up other accidents involving railcars containing dangerous materials that could explode and injure innocent homeowners and children." Further, we find that the two comments mentioning "John Q. Public" were too vague to infer resulting substantial prejudice.

¶ 60    Similarly, we find no prejudice from the few comments that defendant claims improperly referred to other railroad injuries, as the comments did not refer to any specific cases or suggest that defendant was found at fault in any prior incidents. Finally, to the extent defendant claims

plaintiff's counsel portrayed defendant as "motivated by greed," defendant cites no instance in the record where plaintiff's counsel accused defendant of "greed." Moreover, defense counsel failed to object to the statement that "capacity is more important to this railroad than safety," waiving that challenge. See *id.* Further, we cannot infer that prejudice resulted from plaintiff's counsel's other vague references to "revenue" or "capacity." As we do not find that any of the challenged comments were so prejudicial "that the result would have been different" had they not been made (see *Davis*, 2014 IL App (1st) 122427, ¶ 84), we do not find that the comments warrant reversal.

¶ 61    Defendant's fifth claim of error concerns the jury instructions regarding damages. Specifically, defendant claims that it was improper for the jury to be instructed to award damages for "pain and suffering and disability," with a corresponding line on the verdict form to itemize such damages. Defendant argues that in an FELA case, damages for "disability" may be considered as *part of* an award for pain and suffering, but is not an independent measure of damages *in addition to* pain and suffering. Defendant relies on two FELA cases, which held that it was improper to instruct the jury that it may award separate damages for "loss of enjoyment of life" or "loss of vitality" (see *Dugas v. Kansas City Southern Ry. Lines*, 473 F.2d 821, 827-28 (5th Cir. 1973)) or for "loss of a normal life" (*Van Holt v. National R.R. Passenger Corp.*, 283 Ill. App. 3d 62, 75 (1996)).

¶ 62    In response, plaintiff first claims that defendant forfeited this argument. Plaintiff acknowledges that defendant's counsel objected to plaintiff's proposed verdict form, which included separate lines to itemize damages for "disability" and "pain and suffering." After that objection, the trial court decided "to put [disability and pain and suffering] on the same line." Plaintiff argues that defendant failed to additionally object to the resulting verdict form. We disagree. At the instruction conference, defendant's counsel argued: "Disability is not a separate element of damages under the FELA. It's included in pain and suffering." Further, defendant additionally proposed an alternative verdict form that omitted any reference to damages for "disability." Thus, defendant's argument was preserved.

¶ 63    On the merits, we note that the damages available in a case under the FELA is governed by federal law, not state law. *Balough v. Northeast Illinois Regional Commuter R.R.*, 409 Ill. App. 3d 750, 772 (2011). The FELA cases cited by defendant hold that it is improper to instruct the jury that damages for "loss of enjoyment of life" or "loss of a normal life" may be calculated separately from pain and suffering. *Dugas*, 473 F.2d at 827-28; *Van Holt*, 283 Ill. App. 3d at 75.

¶ 64    Significantly, defendant does not cite, and we have not seen, any federal FELA cases holding that a jury may not consider "disability" damages separate from pain and suffering. However, this court, in an FELA case, has held that "disability is separate and distinct" from pain and suffering. *Dixon v. Union Pacific R.R. Co.*, 383 Ill. App. 3d 453, 471 (2008). In *Dixon*, the circuit court entered judgment on a jury verdict awarding plaintiff separate amounts for pain and suffering and economic loss, but zero damages for disability. *Id.* at 465. Plaintiff appealed, arguing that the jury's failure to award disability damages was against the manifest weight of the evidence. *Id.* at 469. We explained:

        "[T]he issue with respect to the zero award comes down to *** was it 'reasonably related' to the physical disability that prevented plaintiff from returning to work at his old job? [Citation.] When evaluating reasonable relationship, *we must keep in mind that disability is separate and distinct from either lost earnings or pain and suffering*.

- 13 -

Unlike economic damages *** a disability award is 'not as readily as calculable in money and jurors must draw on their real life experiences in making an award.' [Citation.]" (Emphasis added.) *Id.* at 471.

We remanded for a new trial solely on the issue of disability damages, given "uncontroverted" evidence that plaintiff was disabled. *Id.* at 472-73.

¶ 65      Defendant's reply brief argues that *Dixon* should not govern in this case because it did not address a specific argument that a separate disability award was improper. Nonetheless, defendant cites no federal FELA precedent discussing the propriety of separate disability damages, and this court's decision in *Dixon* unequivocally states that disability damages are separate from pain and suffering. Thus, we find *Dixon* controlling. Further, other decisions from this court recognize the availability of separate awards for disability and pain and suffering. See, *e.g.*, *Rodriguez*, 2012 IL App (1st) 102953 (affirming judgment on a verdict awarding $75,000 damages for pain and suffering but zero damages for disability, where the jury instructions separately referred to "disability" and "pain and suffering," after rejecting plaintiff's claim that verdict was legally inconsistent); *Templeton v. Chicago & North Western Transportation Co.*, 257 Ill. App. 3d 42 (1993) (holding that verdict including separate amounts for disability and pain and suffering was not excessive, without discussing the jury instructions on damages). As a result, we do not find that the verdict form's itemization of damages for "pain and suffering and disability" on a single line constituted error.

¶ 66      Defendant's final claim of error is that the jury's verdict was excessive, to the extent it awarded $19 million for pain and suffering and disability. Defendant argues that plaintiff was doing well overall at the time of trial, noting that plaintiff is able to drive, lives alone without caregiver assistance, and admitted that he is not regularly taking pain medications. Defendant also emphasizes that, at the time of trial, plaintiff was employed as a railroad dispatcher, a sedentary job that pays him more than he earned as a conductor. Defendant thus requests a new trial or, in the alternative, a remittitur in the amount of $10 million.[6]

¶ 67      "We may reverse or modify a damages award as excessive only if it is unfair and unreasonable, if it results from passion or prejudice, or it is so excessively large that it shocks the conscience. [Citation.]" *Donnellan v. First Student, Inc.*, 383 Ill. App. 3d 1040, 1063 (2008). "[A] damages award will not be subject to remittitur if it falls within the flexible range of conclusions which can reasonably be supported by the facts, because the assessment of damages is primarily an issue of fact for jury determination. [Citations.]" *Roach v. Union Pacific R.R.*, 2014 IL App (1st) 132015, ¶ 71. "There is no mathematical formula for deciding whether a jury award is fair and reasonable." *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 67. Factors that may be considered include "the extent of the injuries suffered and the permanency of the plaintiff's condition, the plaintiff's age, the possibility of future deterioration, *** and the restrictions imposed on the plaintiff by the injuries." *Id.*

---

[6]We briefly reject plaintiff's contention that defendant forfeited any right to challenge the amount of damages because defense counsel at trial "offered no medical rebuttal," "conducted almost no cross examination" of plaintiff's witnesses regarding damages, and "ignored damages other than lost wages" in closing argument. Plaintiff fails to cite any case suggesting that such conduct at trial forfeits the right to argue that a verdict is excessive. In any event, defendant's closing argument asserted that the noneconomic damages suggested by plaintiff's counsel were "not reasonable."

- 14 -

¶ 68    In this case, it was undisputed that plaintiff's heel bone was shattered and much of the flesh on the bottom of his foot was torn off. To avoid amputation, flesh from plaintiff's thigh was harvested and attached to his foot. Plaintiff underwent 12 surgeries over the next few years to reconstruct the heel. Plaintiff's recovery had several setbacks, including infections. Plaintiff and other witnesses described a recurring cycle in which the wound would reopen, followed by long periods in which he could not put weight on his left foot until the wound closed. The jury heard testimony that for the majority of the time between the September 2011 injury and the 2015 trial, plaintiff's wound was at least partially open.

¶ 69    Plaintiff could drive by the end of 2011, but he was not medically cleared to work until late 2014. He cannot resume his job as a conductor, but is limited to sedentary work because he cannot bear weight on his left foot. He must keep the left leg elevated to avoid swelling, and he must change the dressings on the wound every day. Plaintiff testified that he cannot walk safely without wearing a special orthotic shoe and brace, and he still uses a shower chair. At the time of trial, he was receiving therapy to learn to walk with a different gait to avoid putting weight on his left heel. Plaintiff testified that he has never had a "pain-free day" since the injury and that he fears the possibility of amputation.

¶ 70    Dr. Gates testified that plaintiff's injury has led to a number of chronic, permanent conditions, including bone infection (osteomyelitis), nerve damage in the left foot, and swelling (lymphedema) in his left leg. Dr. Gates predicted that plaintiff's left leg will "become arthritic and more and more painful as the years go on," that plaintiff will suffer lower back pain, and that he will have "ambulation problems for the rest of his life."

¶ 71    Dr. Grevious estimated he would have to see plaintiff "one to two times a year" and agreed that plaintiff, who was 34 years old at the time of trial, may need surgery every four or five years. Both Dr. Grevious and Dr. Gates testified that plaintiff remains at heightened risk for amputation. Defendant did not present any medical testimony to contradict these opinions.

¶ 72    The jury heard largely unrebutted evidence about the severity of plaintiff's injury, recurring complications in his recovery, his ongoing pain, permanent disability, and expected future health problems. In light of that evidence, we cannot say that the jury's award was unreasonable, resulted from passion or prejudice, or shocks the conscience. *Donnellan*, 383 Ill. App. 3d at 1063.

¶ 73    We note defendant's contention that the two cases "involving the most similar foot injuries" resulted in significantly lower awards of $4.5 million and $9.6 million for pain, suffering, and disability.[7] Outside the FELA context, "Illinois courts have traditionally declined to make comparisons when determining whether a particular award is excessive. [Citations.]" *Velarde v. Illinois Central R.R. Co.*, 354 Ill. App. 3d 523, 541 (2004). Although in a FELA case, other verdicts may be compared to assess the reasonableness of a jury award (see *Nairn v. National R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir. 1988)), a railroad seeking reduction of a jury award "must do more than simply establish that some plaintiffs with similar injuries were awarded smaller verdicts, it must show that the jury's verdict in this case is

---

[7]Defendant relies on the Cook County Jury Verdict Reporter summaries of Frigo v. Silver Cross Hospital, No. 00-L-11559 (Cir. Ct. Cook. Co.) (tried August 10-26, 2004; infection following surgery led to amputation of foot at the ankle), and Neuhengen v. Global Experience Specialists, Inc., No. 12-L-11854 (Cir. Ct. Cook Co.) (tried August 4-27, 2015; forklift injury resulted in disfigured foot, permanent limp, and arthritis).

clearly outside the maximum limit of a reasonable range." (Internal quotation marks omitted.) *Ahlf v. CSX Transportation, Inc.*, 386 F. Supp. 2d 83, 89 (N.D.N.Y. 2005) (cases with lower verdicts "are not dispositive of what constitutes a reasonable jury award"). The injuries in the cases cited by defendant bear some similarities to this case. However, this case is distinguishable, given the undisputed evidence of the numerous complications in plaintiff's lengthy recovery, as well as the various challenges he faces in his long-term prognosis. Considering the particular facts of this case, the verdicts cited by defendant do not alter our conclusion that the jury's award was not unreasonable or excessive.

¶ 74    For the foregoing reasons, we affirm the circuit court of Cook County.

¶ 75    Affirmed.